REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 379

September Term, 2015

_____

LOCKHEED MARTIN CORPORATION

v.

VINCENT BALDERRAMA

_____

Graeff,
Leahy,
Wilner, Alan M.
    (Retired, Specially Assigned)

JJ.
_____

Opinion by Graeff, J.
_____

Filed: March 31, 2016

*Judge Kevin F. Arthur did not participate,
pursuant to Md. Rule 8-605.1, in the Court's
decision to report this opinion.

This case arises from a lawsuit filed in the Circuit Court for Montgomery County by Vincent Balderrama, appellee, against Lockheed Martin Corporation, his former employer, alleging that Lockheed Martin terminated his employment in retaliation for claiming that his negative performance evaluation resulted from discrimination based on national origin. Although Mr. Balderrama also sued on the ground of discrimination based on national origin, the circuit court granted Lockheed Martin's motion for summary judgment on that claim, finding that there was not legally sufficient evidence to support it. The sole issue presented to the jury was the claim that Lockheed Martin fired Mr. Balderrama in retaliation for making a complaint of discrimination. The jury found in favor of Mr. Balderrama and awarded him $830,000.

On appeal, Lockheed Martin presents several questions for our review, which we have rephrased slightly, as follows:

1. Did the circuit court err in finding that Mr. Balderrama's retaliation claim presented a jury question and in not granting judgment in favor of Lockheed Martin?

2. Did the circuit court abuse its discretion in denying a new trial after the jury awarded $830,000 in damages?

3. Did the circuit court err or abuse its discretion in awarding excessive fees and costs?

For the reasons set forth below, we answer the first question in the affirmative, holding that Mr. Balderrama did not produce sufficient evidence to submit the retaliation claim to the jury. Accordingly, we shall reverse the judgment of the circuit court. [1]

---

[1] Given our resolution of the first issue, we do not address the second and third issues.

## FACTUAL AND PROCEDURAL BACKGROUND

### Background and Early Years

Mr. Balderrama stated in his amended complaint that, at the time of filing, he was a 58-year-old Hispanic male. He was hired by Lockheed Martin in 2004 to fill the role of Business Development Manager. In 2007, Mr. Balderrama transferred to the Mission Systems and Sensors Integration Division. He was tasked with, *inter alia*, "identifying and qualifying international sales opportunities of MH-60 Seahawk helicopters for sale to governments of countries in his portfolio." Mr. Balderrama was a member of "Team Seahawk," a cooperative enterprise comprised of multiple teams within multiple organizations, with the unifying goal of producing and marketing Seahawk helicopters internationally.[2]

During his first five years with the company, Mr. Balderrama was considered a "higher performer." In 2009 and 2010, however, Mr. Balderrama's then supervisor, Ron Christensen, gave him a significantly lower performance rating than in previous years. For the 2010 evaluation year, Mr. Christensen gave Mr. Balderrama an overall performance score of 3 out of 5, which corresponds to "acceptable" performance.

---

[2] These organizations included Lockheed Martin, the United States Navy, Raytheon Company, General Electric, and Sikorsky Aircraft Corporation.

**Mr. Balderrama's Ratings Continue to Decline Despite Team Seahawk Win**

In January 2011, Doug Laurendeau replaced Mr. Christensen as Mr. Balderrama's immediate supervisor. Mr. Laurendeau gave Mr. Balderrama the same "acceptable" score of 3 out of 5 for his performance in 2011.

In 2012, Mr. Balderrama, acting as "business development lead," was tasked with selling Seahawk helicopters to Denmark. That year, Team Seahawk succeeded in selling nine helicopters to Denmark, a sale of approximately $700 million, which resulted in approximately $130 million in gross revenue to Lockheed Martin. Mr. Balderrama's customer relationships were credited as having a "tangible impact on the win."[3] In February 2013, Lockheed Martin issued an "Independent Lessons Learned" document that rated positively Team Seahawk's work on the Denmark "capture."

Despite the significant Team Seahawk "win," Mr. Balderrama's supervisors were not satisfied with his performance during that year, particularly his failure to follow management direction and his inability or unwillingness to communicate with his team. Mr. Balderrama would disparage Mr. Laurendeau's managerial decisions and "bad-mouth" him in conversations with senior members of their Navy customer. Mr. Laurendeau believed that Mr. Balderrama was either unwilling or unable to create a "political call plan" that would establish acceptable customer "counterparts," and instead, he contacted those "counterparts" himself. In some instances, Mr. Balderrama violated company policy by

---

[3] A "win" is vernacular used by Lockheed Martin to refer to beating a competitor in a sales competition.

contacting senior Navy officials that he was not authorized to engage. Mr. Laurendeau gave Mr. Balderrama a lower performance rating for 2012, which placed him in the bottom 10% of employees in his peer group at Lockheed Martin.

Prior to notifying Mr. Balderrama of his evaluation, Mr. Laurendeau notified his supervisor, George Barton, and Cindy Gadra, a member of Lockheed Martin's human resources department. He stated that, although Mr. Balderrama "brings some significant strengths to the team," Mr. Balderrama had "not been successful at demonstrating improvement" in areas of development that had been discussed. Mr. Laurendeau expected that Mr. Balderrama would be upset with his performance review, and he proposed a meeting with Mr. Shultz to bring the issue to his attention so Mr. Schultz would not be "blindsided" if Mr. Balderrama reached out to him to challenge his negative evaluation.[4]

### Mr. Balderrama's 2012 Performance Review

On February 12, 2013, Mr. Laurendeau met with Mr. Balderrama to discuss his performance review for 2012. Mr. Laurendeau credited Mr. Balderrama's contribution to the Denmark win, but he stated "that's not everything." Mr. Laurendeau explained that Mr. Balderrama had not provided him with all the expected plans, and he "tended to do stuff by [him]self" instead of engaging the whole team. When Mr. Balderrama was asked about his "positioning to win" strategy, he "tend[ed] to just come up with anecdotes and not real facts to support [them]."

---

[4] Dan Shultz was Vice President and General Manager of Ship and Aviation Systems.

Mr. Balderrama refuted these criticisms, asserting that he gave Mr. Laurendeau all the requisite plans, and he regularly updated and fully briefed Mr. Laurendeau. He claimed that the problem was that Mr. Laurendeau did not believe the briefings that he received, and he accused Mr. Laurendeau of being unfair. Mr. Balderrama stated: "I gave you all this information, and I don't think you're judging me by the same standard as everybody else."

Mr. Laurendeau then reiterated his criticism that Mr. Balderrama failed to engage his team, and Mr. Balderrama did not engage executives and allow them to establish relationships with their counterparts in Denmark, but rather, he "stifled [management] at every opportunity to do that." Mr. Balderrama again disputed these allegations. He stated that, even though the Danes with whom they were negotiating stated that they did not want executives "parachuting" into their negotiations, the Lockheed Martin executives nonetheless had numerous opportunities to meet with Danish officials.

Mr. Laurendeau credited Mr. Balderrama for knowing a lot of people and "understanding external stakeholders," but he was not happy that Mr. Balderrama engaged Danish politicians by himself when that role should have been reserved for more senior employees. He also criticized Mr. Balderrama for failing to "take advantage of the diverse opinions." He stated that he was

> getting feedback from the PMT, the program team, and from management that you don't listen, that you don't take in people's advice and you don't listen to what they're saying in meetings -- you're talking too much. You're not getting in the different perspective views of other people. You just have your own agenda and you pursue it, despite what other people are trying to give their opinions on.

Mr. Balderrama responded that his meeting with Danish politicians was authorized, and he argued that he had "always taken in people's opinions," and he was a "team player," as well as a "team leader."

Mr. Laurendeau then told Mr. Balderrama that, "when you add all these things up together, the total average comes out to you're in the bottom ten percent of [your] peer group." Mr. Balderrama responded:

> Are you kidding me? I'm in the bottom ten percent? I mean, we won Denmark. We've been a team player with everybody. Everybody except for you [Mr. Laurendeau] seems to think that I did a wonderful job, you know? I just think you've been -- I've said it before. I think you're prejudiced. I think this whole thing is -- you've been measuring -- this shows you've been measuring me by a different yardstick.

Mr. Balderrama stated that Mr. Laurendeau was "speaking in generalities," and he asked for specific examples of misbehavior. Mr. Laurendeau stated that Mr. Balderrama did not get executive management or other leadership engaged. Mr. Laurendeau advised that his review was "a fair and accurate assessment" of Mr. Balderrama's performance in 2012. Mr. Balderrama responded:

> You've been prejudiced to me. This is -- it's a pure example again of how you've been measuring me by a different yardstick. You didn't even look at the facts. . . . I don't get it. I don't understand it. That's unfair. You know? I have to do something about this. I can't let this stand.

Mr. Laurendeau asked Mr. Balderrama what he intended to do, and Mr. Balderrama replied that he did not know, but he would talk to Dan Schultz. Mr. Laurendeau stated that Mr. Schultz was "not in the chain," to which Mr. Balderrama replied that Mr. Schultz knew him, and he would have to talk to human resources "or something else." Mr. Laurendeau

told Mr. Balderrama that he was "free to talk to HR," and he referred Mr. Balderrama to Ms. Gadra.

Mr. Balderrama signed his performance review on February 28, 2013, after adding the following comments:

> I refute the evaluation of my supervisor and intend to submit for formal redress and appeal to Human Resources. The evaluation of my supervisor is a prejudiced assessment that failed to accurately recount and assess my contributions and accomplishments. Many of my supervisor's evaluation comments fail to correlate directly to agreed upon specific measurements of commitment objectives. Moreover, many of his comments lack specificity and contain broad generalities that can be refuted by facts. I question his general comments that characterize my contributions to strongly imply, if not overtly state, that my leadership of the Denmark campaign lacked early and detailed planning and was less than effective. Yet, Denmark was a WIN for MST [Mission Systems and Training]- a win against a lower priced, very aggressive competitor in their own "backyard." In fact, it was the *only* Maritime Helicopter win for MST in 2012 and the culmination of a five-year campaign. My supervisor makes numerous claims of my lack of engaging the "broader organization"; yet he has never defined the "broader organization". My capture execution directly engaged the counsel and support of the expanse of LM to include functional organizations, programs . . . as well as Team Seahawk teammates from the Navy, Sikorsky and other US Industry and Danish Industry. That seems to me to be the "broader organization." My supervisor claims that I was less than responsive in providing [a Price/Position-to-Win strategy], offset plans, political plans, and media plans yet I can provide numerous revisions of all those plans that had been provided to my supervisor. My supervisor repeatedly makes claims that I failed to make plans or enable appropriate relationships to be established by senior management. This claim once more reveals my supervisor's continued failure to understand and accept the *cultural* Danish attitudes and desires in contact with politicians and key stakeholders. Moreover it reveals his failure to acknowledge that senior management and executives were exposed to Her Majesty, the Queen of Denmark, on multiple occasions the Danish Ambassador to the U.S. and his Defense Attaché . . . and they were also introduced to the majority of the Danish Defense Committee. These aforementioned factual examples are just a few counterpoints to inaccuracies or misrepresentations by my supervisor of my performance and contribution in 2012. A more detailed reclama will be provided to Human Resource along

with a request for independent review and adjustment upward of my performance evaluation.[5]

On March 1, 2013, Mr. Laurendeau forwarded his comments to Ms. Gadra in human resources.[6]

**Mr. Balderrama Appeals His 2012 Performance Evaluation**

On March 5, 2013, Mr. Balderrama emailed Ms. Gadra, indicating his desire to file an appeal of his 2012 performance evaluation. He stated that his "reclama" would "assert that the evaluation of [his] supervisor [was] a prejudiced assessment that failed to accurately recount and assess [his] contributions and accomplishments."[7]

---

[5] William Paradies, Mr. Balderrama's co-worker on the Denmark campaign, testified at trial that he felt that he and the other members on the Demark team "were doing everything that needed to be done, could be done to put us in the best position to win that campaign in Denmark." He acknowledged that there was an ongoing "battle" over the team's strategy between the "capture team," including him and Mr. Balderrama, and management, including Mr. Laurendeau, George Barton, Mr. Laurendeau's supervisor, and Michelle Evans, Mr. Barton's supervisor. Mr. Paradies also received a lower performance rating in 2012, but he was "not surprised by it" because they "battled openly" with Mr. Laurendeau over strategy. He felt his performance review was unfair, but he felt vindicated because they had won the Denmark campaign.

[6] Mr. Laurendeau testified that, given the performance evaluation, there was a discussion about whether to put Mr. Balderrama on a Performance Improvement Plan ("PIP"), a standard way to identify deficiencies in performance and determine how to measure improvement. Mr. Laurendeau recommended, however, that they start with an informal coaching regime instead, where the expectations could clearly be laid out. He implemented an informal set of expectations in April.

[7] Mr. Balderrama used the term "reclama" to describe the performance rating appeal process available through the human resources department at Lockheed Martin. "Reclama," is a military term meaning a "request to duly constituted authority to reconsider its decision or its proposed action." *Department of Defense Dictionary of* (continued . . .)

On March 15, 2013, Mr. Balderrama emailed a sixteen-page reclama to Ms. Gadra. In the body of the email, Mr. Balderrama noted the following:

> I have thought long and hard on whether to pursue an effort to seek redress of my supervisor's evaluation of my performance in 2012. Given the state of our business and future outlook I feel I cannot let it stand. To do so places me at great risk to my career and future opportunity in the Corporation.[8]

In his "reclama," Mr. Balderrama responded to each of Mr. Laurendeau's criticisms noted in his performance review. For example, he argued that Mr. Laurendeau's "claim that [Mr. Balderrama's] lack of inclusion of others' opinions and collaboration is unsubstantiated. If anything, his claim is directly related to [their] personal disagreements on the best way to pursue and win Denmark." Moreover, he "especially refute[d] [Mr. Laurendeau's] comment that [their] campaign was 'less than effective,'" stating: "How much more effective can you get than by *Winning* the pursuit?" He requested review of his evaluation and sought "to strike this evaluation from [his] record."

Mr. Balderrama made no indication at this time that he was alleging discrimination on the basis of age, race, ethnicity, national origin, or other protected class. Mr. Balderrama later emailed Ms. Gadra, offering to provide her evidence that he believed would substantiate his complaints.

---

(. . . continued) *Military and Associated Terms* 451 (as amended through July 12, 2007), *available at* perma.cc/8R4F-GRAS.

[8] Mr. Balderrama subsequently told Ms. Gadra that he had to seek further appeal because he was put "in a precarious position in the event of layoffs."

On March 15, 2013, Ms. Gadra began an investigation of Mr. Balderrama's claims. Based on his appeal, she was not investigating a complaint of discrimination, but rather, she was investigating "an appeal to the performance review system." Ms. Gadra interviewed Mr. Balderrama and four of his co-workers: George Barton (Mr. Laurendeau's boss); Jack McCreary; Tom Kane; and Andy Cox.[9]

Although some comments were positive, several co-workers advised that Mr. Balderrama was difficult to get along with and caused frustration. For example, one person stated: Mr. Balderrama was asked to set up executive calls for a "capture," but he said "no." This person also stated that Mr. Balderrama was untrustworthy, noting that Mr. Balderrama gave "bad information and sometimes made up things, spinning things rather than providing facts." Other comments included criticism of Mr. Balderrama's communication and social skills, including that any communication with Mr. Balderrama was one way, and Mr. Balderrama told "everyone else what to do" and did not listen to other people's ideas.

After concluding her interviews, Ms. Gadra created a document that contrasted Mr. Balderrama's assessment of his performance with Mr. Laurendeau's assessment. She followed-up with Mr. Laurendeau to "get his feedback on where there were gaps in their assessment[s]." She then summarized her investigation, formed an assessment of Mr. Balderrama's appeal, and submitted a report to Lockheed Martin's Equal Employment

_____

[9] Ms. Gadra referred to the people she interviewed as "stakeholders," which she defined as persons "that you work with closely that [are not] your direct reporting chain that may have input to your performance assessments for that year."

Opportunity ("EEO") office, which was "standard practice for every performance rating appeal." In response to questions listed on the report, she stated that no protected characteristics were mentioned and there were no indicators that the complaint involved any protected characteristics. Ms. Gadra concluded that Mr. Balderrama's "performance evaluation for 2012 would stand," which meant that his rating would remain in the bottom 10% tier.

On April 10, 2013, Ms. Gadra spoke with Mr. Balderrama to discuss the results of her investigation. Ms. Gadra testified that, during that phone call, Mr. Balderrama reiterated that the 2012 performance review was a "prejudice[d] assessment." Ms. Gadra asked him what he meant by "prejudice," and Mr. Balderrama responded that he felt "pressured." Mr. Balderrama never mentioned race, national origin, ethnicity, or any other protected characteristic. She stated that

> [t]he term prejudice can mean many different things. It was never stated anywhere that Mr. [Balderrama] felt he was prejudiced against. He stated it was a prejudiced assessment. In other places he stated it was an unfair assessment, a distorted assessment. That term seemed to be interchangeable with those other terms and he went on to be very specific about what he disagreed with in the assessment. So my focus was on the assessment.

Mr. Balderrama agreed that he never explicitly mentioned a protected characteristic. He stated, however, that he expected that Ms. Gadra, "as an HR experienced, very senior person, who she said has gone through a lot of these things," would understand what prejudice meant from a Hispanic male.

Ms. Gadra testified that, during her conversation with Mr. Balderrama, he stated that he would have to continue appealing because she set him up and put him in "a

-11-

precarious position in the event of layoffs." In her notes from the conversation, Ms. Gadra concluded that Mr. Balderrama was "not taking responsibility for his actions," "[i]ssues are others [sic] fault, not his," and "[i]t's unlikely there will be performance improvement in 2013 based on this discussion."

## Mr. Balderrama Seeks Further Review, Alleging National Origin and Age Discrimination

On April 11, 2013, Ms. Gadra emailed Mr. Balderrama to inform him that Melonie Parker was the director of Lockheed Martin Human Resources, and if he planned "to escalate the decision further," he should contact Ms. Parker. He advised that he did wish to pursue the matter.

Ms. Gadra's entire file, including Mr. Balderrama's reclama, Ms. Gadra's notes, and her report, was then sent to Ms. Parker. Ms. Parker did not conduct any further investigation. She stated that she reviewed all the documentation related to Mr. Balderrama's appeal and was "very comfortable with the case."

On May 9, 2013, Ms. Parker called Mr. Balderrama to discuss his appeal. Mr. Balderrama told Ms. Parker that he felt that his low 2012 rating was due to discrimination based on his national origin and age. Ms. Parker asked him if he could provide her with any specific examples of discrimination, but he could not. Based on her review of Ms. Gadra's file and report, she told Mr. Balderrama that she did not believe that his negative performance review was a result of age or national origin discrimination.

When she concluded her conversation with Mr. Balderrama, however, Ms. Parker contacted the senior manager of their EEO office, Sue Heisler, and advised her that

Mr. Balderrama believed his rating was based on national origin and age discrimination. She explained that her role in the process was to review Ms. Gadra's investigation to confirm whether Mr. Balderrama's performance rating was appropriate, and when Mr. Balderrama alleged age and national origin discrimination, she turned that aspect of his complaint over to their EEO office for further investigation.

On June 6, 2013, Mr. Balderrama sent Ms. Parker an email containing a list of persons that he recommended she interview regarding his performance review. He noted that "[t]his senior, peer and teammate group can provide testimony on the completeness and effectiveness of our effort with respect to Denmark and the senior management internal tension that was prevalent." He also offered to provide documentation to refute the allegedly "late, incomplete and ineffective" plans that Mr. Laurendeau noted in Mr. Balderrama's performance review. Mr. Balderrama did not indicate that any of these witnesses could corroborate his claims of age or national origin discrimination.

On June 14, 2013, Ms. Heisler emailed Ms. Parker and Ms. Gadra with the results of her EEO investigation. Ms. Heisler stated the following:

> I looked at his [Calibration Peer Group ("CPG")] and the question of Race/Age being a factor. His CPG is comprised of all people in their Mid-50's and above and age does not appear to be an issue. Regarding race, there is a reasonable distribution among the various ratings (minorities are represented in all tiers). This, combined with the feedback from multiple sources on his performance indicates to me that there is not a reason to feel his rating/tier is based on either age or race.
>
> Because he reached out to [Ms. Parker], she . . . should close with [Mr. Balderrama] and indicate that we looked into the possibility of race/age being a factor in his performance rating/tier and found that the rating was based on substantiated performance rather than age/race.

-13-

**June – October 2013**

In June 2013, Lockheed Martin issued a revised, final version of its "Lessons Learned" document for the Denmark initiative, a document regularly created to discuss what the company needed to "do better going forward." The original document, created in February 2013, rated Team Seahawk's performance positively in all categories. After reviewing the initial document, Michelle Evans, Vice President of Lockheed Martin, felt that it was inadequate and incomplete because it lacked input from key individuals who could provide additional insight. She noted that "[t]here had been a lot of discussion and contention through the whole bid over the price to win, and . . . the lessons learned didn't accurately reflect all of the dialogue contention that I continued to see through the whole campaign . . . and acquisition process." Ms. Evans "asked the team to go back and do additional interviews, and really make sure it was a thorough work product of what did we learn" and "what could we have done better." The revised version of the Denmark "Lessons Learned" document was more critical of the team's performance, including the "Customer Relationships," "Shape-the-Game & Win Strategy," and the "Positioning-To-Win (PTW) Goals" categories. The document cited the lack of (1) involvement of senior management with leadership, and (2) internal consensus on the PTW as areas that needed improvement.

On June 20, 2013, Jack McCreary, Program Director, sent an email to Mr. Laurendeau about Mr. Balderrama. He stated that his week with Mr. Balderrama "alternated from extremely frustrating to an acceptable level of support."

On July 22, 2013, Mr. Laurendeau met with Mr. Balderrama to conduct an interim performance review pursuant to the informal coaching regime that had been implemented to identify deficiencies and expectations. Mr. Laurendeau advised Mr. Balderrama that several of his commitments were at risk of not being successfully completed, that Mr. Balderrama "was still falling short of the bar," and he wanted assurances that Mr. Balderrama intended to meet his performance goals. Mr. Balderrama again disagreed with Mr. Laurendeau's criticisms, arguing that he had not completed certain tasks because he had to "start from scratch," and complaining that Mr. Laurendeau was blocking him from contacting people outside the company. Mr. Balderrama stated that Mr. Laurendeau was "treating [him] differently from the other guys," and he argued that Mr. Laurendeau did not require his predecessors to perform the same tasks.

Mr. Laurendeau testified that, because there was a lack of commitment by Mr. Balderrama to work on the issues, they decided to make the "performance improvement regime" more final for Mr. Balderrama. Mr. Laurendeau stated that, at this point, he was not aware that Mr. Balderrama had made a complaint of age and national origin discrimination, and he was not aware that the company was going to go through a reduction in force.

On September 4, 2013, Ms. Gadra learned that Mr. Balderrama was part of the "Special Recognition Award Team" that was scheduled to receive an award for the Denmark win. She testified that she was concerned that giving Mr. Balderrama an award at the same time that they were putting him on a performance improvement plan would

send mixed messages. Ms. Parker also was concerned about sending the "wrong message" to Mr. Balderrama. Mr. Balderrama's supervisors decided, however, that he was a "major contributor" to the Denmark win, and he was included in the award.

On September 5, 2013, Ms. Parker met with Mr. Balderrama to "close out" his appeal. Ms. Parker informed him that his bottom 10% rating was "substantiated and won't be changed." She informed Mr. Balderrama that she was "the last step" in the appeals process, and therefore, his appeal had reached its conclusion.

On October 1, 2013, due to Mr. Balderrama's "continued need for performance improvement," Mr. Laurendeau placed him on a 90-day PIP. Mr. Laurendeau was not aware at this time that Lockheed Martin was planning on reducing its workforce.

**Lockheed Martin Includes Mr. Balderrama in its Reduction in Force**

On October 16, 2013, Lockheed Martin issued a memorandum stating that, due to "ongoing uncertainty in Washington regarding the budget, sequestration and government operations," it was going to "lay off approximately 600 U.S. employees." Michelle Evans, vice president of Lockheed Martin and Mr. Balderrama's third-level supervisor, testified that the employees who were to be terminated were selected using a "reduction in force" ("RIF") tool that was developed by Lockheed Martin to aid in the RIF process. She testified that the RIF tool used objective criteria to assess employees, including the average

-16-

performance review scores for each employee from the last three years.[10] Lockheed Martin's managers then updated the performance scores of each of their subordinates, rating them on five skills that were considered critical for each department. The skill set for business development employees included, among others, effective communication skills and being a team player. The tool calculated the scores, indicating whether any particular manager was scoring unusually high or unusually low. Lockheed Martin executives could then review the employee performance scores, which were calculated to reflect each employee's performance over the past three years.

In mid-October, Mr. Laurendeau and the company's other managers were asked to review the skills of each of the employees working under them. The initial skill ratings for each employee in the RIF tool were pre-populated, i.e., the tool had a complete set of employee scores already filled-in before Mr. Laurendeau began his review.[11] Mr. Laurendeau was asked simply to see if the skill ratings "were still appropriate, and, if not, to update them, and change them." Mr. Laurendeau adjusted one employee's scores down (indicating poorer performance) and two employees' scores up (indicating positive performance). Mr. Laurendeau did not make any adjustments to Mr. Balderrama's skill scores.

---

[10] The testimony indicated that the relevant assessments here were for 2010, 2011, and 2012, and the appraisal for 2010 was from a previous manager, Ron Christensen, who had given Mr. Balderrama a performance appraisal that was lower than prior years.

[11] Doug Laurendeau, Mr. Balderrama's immediate supervisor, testified that he did not know who created the initial scores that appeared automatically in the reduction in force (RIF) tool when he accessed it for his review.

Ms. Parker, Mr. Barton, and Ms. Evans testified that the final decision regarding who would be laid off was Ms. Evan's decision. Ms. Parker and Mr. Barton, however, had a role in the RIF process.

Ms. Parker's role included providing Ms. Evans with information about the company's poorest performers. On September 27, 2013, shortly before the reduction in force announcement was made, Ms. Evans emailed Ms. Parker, asking her for a list of "low performers" that management could consider, acknowledging that they "spoke of Vince Balderrama." Ms. Evans stated that they recently had gone through another RIF, so she "kind of knew who [the] bottom performers were, and who was at risk." Ms. Parker testified that she had discussed Mr. Balderrama with Ms. Evans as a low performer in the business development organization, but she never spoke to Ms. Evans about Mr. Balderrama's complaints of discrimination. She stated that she "would never share that information."

Mr. Barton testified that his limited involvement in the RIF process began after the managers, including Mr. Laurendeau, completed their review and update of their employees' current performance scores. At that point, once the scores were calculated by the RIF tool, Mr. Barton gathered his "seven directors to take a look [at the scores], to make sure nobody was grading too hard or too easy and make sure that it was fair." Mr. Barton testified that they made no changes to the scores, and the RIF process proceeded to Ms. Evans for her review. Mr. Barton had read Mr. Balderrama's "reclama," and he was aware that Mr. Balderrama intended to appeal the matter to human resources, but he was

not aware at that time that Mr. Balderrama had alleged national origin and age discrimination. During the meetings in which layoffs were discussed, no mention of Mr. Balderrama's complaints or appeals was made.

The RIF tool rated employee skills on a five-point scale, with a "1" being the best. Of the fourteen employees within the job group "BD Analyst SAS Helicopters," Mr. Balderrama's total score of 3.24 was the worst score in his group, and it was significantly higher than the score of the second worst employee. This total score was due, in part, to Mr. Balderrama's poor performance history over the past three years, which averaged 3.33.

On November 1, 2013, Ms. Evans made her final decision regarding the employees she intended to lay off. On that date, she sent an email to her boss, Paul Lemmo, with a list of nine "business development" employees that were to be included in the RIF, one of whom was Mr. Balderrama. Mr. Lemmo stated that he was "a little surprised at [Mr.] Balderrama as he used to be a high performer." Ms. Evans replied that Mr. Balderrama "had worked for multiple [managers] in just a few years. Having now worked for the same [manager] for [more than two years, she thought that] he [was] being fairly assessed."

Ms. Evans later testified that, upon reviewing Mr. Balderrama's placement at the bottom of his group in the RIF tool, she had no concerns about laying him off because his score "seemed consistent with what [she] had observed" and what was being relayed to her. Ms. Parker similarly stated that Mr. Balderrama was selected for the RIF because,

-19-

based on the RIF tool formula, he was ranked as the lowest performer in his group. Ms. Evans testified that she was not aware that Mr. Laurendeau placed Mr. Balderrama on a performance improvement plan in October 2013. On November 6, 2013, Mr. Balderrama was notified that he was included in the RIF.

**Mr. Balderrama Obtains New Employment Outside the Defense Industry**

After he left Lockheed Martin, Mr. Balderrama remained unemployed for approximately four months. During that time, Mr. Balderrama interviewed with several helicopter manufacturing companies. He was told by those interviewers that he was "great" and "good," but they asked him to "come back in November or December."

Mr. Balderrama eventually accepted a job working as a fundraiser for the U.S. Naval Academy, a position that paid approximately 40% less than he earned at Lockheed Martin. Although Mr. Balderrama was not under contract, he testified that he made an "honorable commitment" to his boss at the Naval Academy, who was a former classmate, to stay with the Naval Academy during their current fundraiser, which was estimated to last for three to five years. Accordingly, Mr. Balderrama stopped looking for work in the defense industry after accepting the position at the Naval Academy.

**Mr. Balderrama Sues Lockheed Martin for Employment Discrimination**

On July 29, 2014, Mr. Balderrama filed a lawsuit against Lockheed Martin. He identified himself as a 58-year-old Hispanic male, and he asserted two counts. Count I alleged discrimination based on national origin and ancestry, asserting that he was issued a negative performance review, whereas other, non-Hispanic employees were not issued

negative performance reviews, and he "was the only individual out of the group of similarly situated employees terminated in the Reduction in Force ("RIF") action." Count II alleged violation of Montgomery County Code ("MCC") § 27-19, asserting that he was terminated because of his protected activity in appealing his performance review based on national origin and ancestry discrimination.

Lockheed Martin subsequently filed a motion for summary judgment, arguing that there was no evidence that demonstrated that Mr. Balderrama's superiors (1) knew of his protected activity when they terminated him, (2) had any bias against him based on national origin or national origin, or (3) tried to improperly influence Ms. Evans' RIF decisions. Lockheed Martin also argued that, even if Mr. Balderrama could establish a *prima facie* case, Lockheed Martin would still prevail because the RIF was a sufficient non-discriminatory explanation for Mr. Balderrama's termination, which Mr. Balderrama had not disputed. Mr. Balderrama argued that summary judgment was not appropriate because there was sufficient evidence that his superiors had a discriminatory bias against him and knew that he was engaging in protected activity.

On February 27, 2015, the circuit court granted Lockheed Martin's motion with respect to Count I (discrimination), finding that there was no genuine dispute of material fact and the evidence was legally insufficient to support that count. It denied the motion with respect to Count II (retaliation), however, stating that a "jury may . . . find that the plaintiff was retaliated against because he complained about alleged discrimination based on national origin."

A five-day trial on the retaliation claim ensued. At the close of Mr. Balderrama's case, Lockheed Martin moved for judgment, asserting that Mr. Balderrama failed to establish a *prima facie* case of retaliation or any retaliatory pretext because he adduced no evidence that could lead the jury to conclude that Ms. Evans, the person solely responsible for laying off Mr. Balderrama, was aware that Mr. Balderrama was engaged in protected activity. The court asked Lockheed Martin to distinguish *Edgewood Management Corporation v. Jackson*, 212 Md. App. 177, 199-200, *cert. denied*, 434 Md. 313 (2013), which held that, even if the supervisor who made the ultimate firing decision was not aware of the complaint of discrimination, a company could be liable if another employee, motivated by discriminatory or retaliatory animus, influenced or played a role in the employee's termination. The court described the *Edgewood* scenario as a "poison pill" or a "snowball rolling downhill," suggesting that a manager such as Mr. Laurendeau, even though he was not involved in the RIF process, could nonetheless retaliate by tainting the process early on with a falsely negative performance review ("poisoning"), and then passing this information up the chain of command, paving the road for Mr. Balderrama's ultimate termination.

Counsel for Lockheed Martin attempted to distinguish *Edgewood*, noting that the claim of discrimination based on natural origin had been dismissed, and the only claim left was for retaliation based on protected conduct. Because Mr. Laurendeau issued the 2012 performance review prior to any protected conduct (which occurred when Mr. Balderrama claimed discrimination based on national origin in May) this case was different from

*Edgewood*. Counsel argued that, because the evidence demonstrated that Ms. Evans did not have knowledge of Mr. Balderrama's complaints, there was no proof of retaliatory motive by Ms. Evans, and Mr. Balderrama's case lacked causation. The court denied Lockheed Martin's motion for judgment.[12]

At the close of evidence, Lockheed Martin stated that it was renewing its motion for judgment, without making additional argument. The court did not expressly rule on the renewed motion, but it denied the motion by implication when it sent the case to the jury for deliberation.[13]

After the jury verdict in favor of Mr. Balderrama, Lockheed Martin filed a motion for judgment notwithstanding the verdict (JNOV) or, alternatively, a motion for a new trial. It argued, *inter alia*, that Mr. Balderrama failed to prove causation between his challenge to his evaluation and his termination because there was no evidence that Ms. Evans, the

---

[12] Subsequently, during discussions prior to the jury instructions, the judge stated that counsel for Mr. Balderrama had convinced him that Mr. Balderrama could win even if Ms. Evans did not know about his discrimination complaint if Mr. Laurendeau gave Mr. Balderrama a bad evaluation "for the wrong reasons," and "this poison pill false job evaluation . . . made its way to the top of the food chain." When the court pressed counsel regarding whether that was his theory of the case, counsel indicated that was not his theory, stating that his theory of the case was that, after Mr. Balderrama complained of discrimination, they fired him, and Mr. Balderrama's complaint was a motivating factor in the decision.

[13] Maryland Rule 2-519(d) provides as follows:

In a jury trial, if a motion for judgment is made at the close of all the evidence, the court may submit the case to the jury and reserve its decision on the motion until after the verdict or discharge of the jury. For the purpose of appeal, the reservation constitutes a denial of the motion unless a judgment notwithstanding the verdict has been entered.

person selecting employees for layoff, had any knowledge of Mr. Balderrama's complaint of discrimination, and there was no evidence that someone with knowledge or a retaliatory motive unduly influenced her decision. Rather, the evidence showed that the layoff process was done using objective performance criteria. The circuit court denied the motion in a brief order.

Mr. Balderrama subsequently filed a petition for attorneys' fees and costs. Lockheed Martin opposed this request, but the court granted Mr. Balderrama's petition, awarding him fees and costs in the amount of $360,285.48.

## DISCUSSION

Lockheed Martin contends that the circuit court erred in allowing the case to go to the jury. It asserts that Mr. Balderrama's retaliation claim did not present a jury question because Mr. Balderrama failed to show that his protected activity caused his layoff. It states that Lockheed Martin presented evidence of a legitimate, non-retaliatory reason that Mr. Balderrama's job was terminated, i.e., that 600 employees were let go due to a RIF, and Mr. Balderrama was included in the RIF due to his poor performance review. Given this evidence, Lockheed Martin argues that Mr. Balderrama had the burden to present evidence that this reason was a mere pretext, and the real reason he was laid off was retaliation for his complaint alleging that his evaluation was based on discrimination, Lockheed Martin contends that Mr. Balderrama failed to present sufficient evidence to generate a jury issue in this regard, and the circuit court erred in failing to grant judgment in its favor as a matter of law.

Mr. Balderrama argues that there was sufficient evidence for the jury to find a causal nexus between his protected activity and an adverse employment action. He contends that Mr. Laurendeau, various supervisors, and the employees in Lockheed Martin's human resources department retaliated against him for filing a complaint of discrimination based on national origin. Mr. Balderrama asserts that causation is a jury question, and based on the evidence presented, a reasonable jury could conclude that the cause of his termination and inclusion in the RIF was retaliation for complaining about his evaluation, which he alleged was based on discrimination due to national origin.

## I.

## Discrimination by Retaliation

"'The common law rule, applicable in Maryland, is that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time.'" *Molesworth v. Brandon*, 341 Md. 621, 628-29 (1996) (quoting *Adler v. Am. Standard Corp.*, 291 Md. 31, 35 (1981)). There are, however, exceptions to "the terminable at will doctrine that abrogate an employer's absolute right to discharge an at will employee for any or no reason." *Adler*, 291 Md. at 35.

Here, the claim that was sent to the jury, and is the subject of this appeal, was based on MCC § 27-19(c), which states, in pertinent part, as follows:

(c) A person must not:
(1) retaliate against any person for:
(A) lawfully opposing any discriminatory practice prohibited under this division; or
(B) filing a complaint, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under this division;

* * *

(g)(1)   Except as provided in paragraph (2), an employer must not discharge or in any other manner discriminate or retaliate against an employee because the employee:

* * *

(B)   asserts any right under this subsection.

Discrimination against an employee because of "race, color, religious creed, ancestry, national origin" or age is prohibited.

As indicated, the circuit court granted Lockheed Martin's motion for summary judgment on the claim that the 2012 evaluation was based on discrimination, but it allowed the claim based on retaliation to proceed to the jury. The United States Supreme Court has explained the difference between antidiscrimination provisions and antiretaliation provisions, stating that:

> The antiretaliation provision seeks to secure that primary objective [a workplace where people are not discriminated against based on a protected class] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct.

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

To address Mr. Balderrama's claim of retaliation pursuant to MCC § 27-19(c), we must determine whether legally sufficient evidence was adduced to support the jury's verdict that Lockheed Martin took an adverse action against Mr. Balderrama in retaliation for challenging his performance evaluation. *See Taylor v. Giant of Maryland, LLC*, 423

-26-

Md. 628, 658 (2011).  To do this, "'we must view the evidence, and the inferences reasonably deducible from the evidence, in a light most favorable to [the plaintiff], looking only to whether, viewed in that manner, it was legally sufficient to create a triable issue.'" *Id.* (quoting *Georgia-Pacific Corp. v. Pransky*, 369 Md. 360, 364 (2002)).

In resolving a claim of retaliation when the employee does not have direct evidence of an intent to discriminate, Maryland has followed the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in which the first step is for the employee to establish a *prima facie* case of discrimination, which gives rise to a rebuttable presumption of discrimination.  *Edgewood*, 212 Md. App. at 199-200.  The parties agree that this framework applies to this case.

In *Edgewood*, 212 Md. App. at 199, a case involving a claim of retaliation under MCC § 27-19, this Court explained: "To establish a *prima facie* case of discrimination based on retaliation, a plaintiff must produce evidence that she [(1)] engaged in a protected activity; [(2)] her employer took an adverse action against her; and [(3)] her employer's adverse action was causally connected to her protected activity."  If the plaintiff meets his or her burden of production in this regard, "the burden of production then shifts to the defendant to offer a non-retaliatory reason for the adverse employment action."  *Id.* at 199-200.  If the employer meets this burden, "the burden of production shifts back to the plaintiff to show that the proffered reasons for the employment action were a mere pretext."  *Id.* at 200.  An employee shows pretext by proving "both that the reason was false and that

discrimination was the real reason for the challenged conduct." *Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 614 (2000).

Here, the parties address extensively whether Mr. Balderrama satisfied his burden of establishing a *prima facie* case. Given the posture of this case, however, that is not the proper inquiry.

In *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983), the United States Supreme Court explained that, pursuant to the *McDonnell Douglas* framework, once the employer has given a non-discriminatory reason for the adverse employment action and "done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." At that point, the inquiry is whether, based on all the evidence presented, the employer intentionally discriminated against the employee. *Id.* Thus, in *State of Maryland Commission on Human Relations v. Kaydon Ring & Seal, Inc.*, 149 Md. App. 666, 698-99 (2003), this Court stated that, where the employer provided evidence that appellant was terminated for poor performance, whether the plaintiff made out a *prima facie* case of discrimination was irrelevant and not a proper issue on appeal.

Other courts similarly have held that the *prima facie* inquiry is a preliminary matter, a mere allocation of burdens and presentation of proof, and when the case has proceeded to trial on the merits, the appellate court should focus on "the ultimate question whether plaintiff has established discrimination." *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997) (quoting *Brownlow v. Edgecomb Metals Co.*, 867 F.2d 960, 963 (6th

Cir. 1989). *Accord Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) ("[W]hether Bates established a prima facie case of employment discrimination in the summary judgment 'burden-shifting' sense is moot after trial. The relevant inquiry now is simply whether the evidence presented at trial supports a finding of liability."); *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 993 (10th Cir. 2005) ("We have repeatedly stated that juries are not to apply the *McDonnell Douglas* framework and that we are not concerned with plaintiff's proof of a prima facie case when we review a jury verdict."); *Gibson v. Old Town Trolley Tours of Washington, D.C., Inc.*, 160 F.3d 177, 181 (4th Cir. 1998) ("Once a case has proceeded through trial, however, whether the plaintiff 'properly made out a prima facie case' in the first place 'is no longer relevant.'") (quoting *Aikens*, 460 U.S. at 715).

In the present case, at this stage in the proceedings, where there has been a full trial on the merits, our analysis does not focus on the procedural question whether Mr. Balderrama met his burden of showing a *prima facie* case. Rather, the question we must decide is whether the record shows a legally sufficient basis for the jury to have found that Lockheed Martin's decision to take an adverse action against Mr. Balderrama was made in retaliation for protected conduct.

Nevertheless, the evidence of the plaintiff's *prima facie* case can be helpful in determining the ultimate issue. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Dobkin v. Univ. of Baltimore School of Law*, 210 Md. App. 580, 593-94 (2013). Accordingly, to the extent relevant, we will discuss those elements.

## II.

## Protected Activity

We address initially whether, and if so when, Mr. Balderrama engaged in protected activity. "An employee's complaint about an employer's allegedly discriminatory conduct, whether through formal or informal grievance procedures, constitutes protected oppositional activity," as long as the employer shows "that he or she held a good faith, subjective, and objectively reasonable belief that the employer engaged in discriminatory conduct." *Edgewood*, 212 Md. App. at 201-02. *Accord Magee v. DanSources Tech. Servs., Inc.*, 137 Md. App. 527, 564 (2001) ("An employee's verbal protests to the employer regarding what the employee perceives as discriminatory practices are protected activities.").

Not every complaint about discrimination or unfairness, however, qualifies as protected activity. A vague complaint alleging mere prejudice or general unfairness is insufficient; it must allege discrimination connected to a protected class. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) ("The complaint must allege that the opposition was to discrimination based on a protected category, such as age or race.");[14] *Slagle v. County of Clarion*, 435 F.3d 262, 268 (3d Cir.) (employee's "vague allegations of 'civil rights' violations" were insufficient to meet the "low bar" of demonstrating participation in protected conduct), *cert. denied*, 547 U.S. 1207 (2006);

---

[14] In *Taylor v. Giant of Maryland, LLC*, 423 Md. 628, 652 (2011), the Court of Appeals recognized Maryland's "history of consulting federal precedent" in employment discrimination cases.

*Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("[T]he complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice.").

Accordingly, the mere fact that Mr. Balderrama complained about his performance review does not, *ipso facto*, mean that he engaged in protected activity. Rather, his complaint about his review constituted protected activity only at the point when he implicitly or explicitly complained of discrimination based on a legally protected characteristic.

Mr. Balderrama did not engage in protected activity until May 9, 2013. Although he filed a 16-page "reclama" in March 2013, this appeal was dedicated to refuting Mr. Laurendeau's specific criticisms of his work performance. At the time, Mr. Balderrama made no mention of discrimination pursuant to any MCC § 27-19 category. To be sure, he stated that the evaluation demonstrated "prejudice," but as indicated, this vague allegation, divorced from any context suggesting national origin or age discrimination, was insufficient to demonstrate participation in protected conduct. Indeed, when Ms. Gadra asked Mr. Balderrama what he meant by "prejudice," he stated

that the "yardstick by which he was measured was not evenly applied," and the review was "unfair, vindictive, and prejudiced."[15]

It was not until May 9, 2013, when Ms. Parker spoke to Mr. Balderrama, that he asserted that his evaluation was based on age and national origin discrimination. At this point, Mr. Balderrama engaged in protected activity and implicated the protection of MCC § 27-19, providing that an employer may not retaliate against any person "lawfully opposing any discriminatory practice." Having concluded that this is the starting point for our analysis, we turn to whether there was an adverse action after that date.

## III.

### Adverse Action

There is no dispute here that Lockheed Martin took an adverse action against Mr. Balderrama after his May 2013 protected action when it terminated his employment as part of the RIF. The pertinent question is whether his termination was motivated by the protected activity.

Before addressing that issue, however, we must discuss Mr. Balderrama's suggestions that earlier actions constituted adverse employment actions. Although actions short of termination may constitute an adverse action, "'not everything that makes an employee unhappy is an actionable adverse action.'" *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th

---

[15] As indicated, Mr. Balderrama conceded that he never mentioned national origin or age to Ms. Gadra when asked what he meant by "prejudice," asserting that it was "her job" to understand that.

Cir.1996)). The Supreme Court has explained that, to constitute "actionable retaliation," the challenged conduct must be "materially adverse," i.e., an action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 548 U.S. at 67-68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1221 (D.C. Cir. 2006)). *Accord Adams v. Anne Arundel Cnty. Pub. Schools*, 789 F.3d 422, 431 (4th Cir. 2015) (Adverse employment action "denotes some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it."); *Edgewood*, 212 Md. App. at 203.

With that definition in mind, we address Mr. Balderrama's claims that actions other than his termination constituted adverse actions. Initially, Mr. Balderrama contends that Ms. Parker and Ms. Heisler retaliated against him by conducting a "sham" investigation of his protected activity. Even assuming, arguendo, that the evidence supported this claim, the failure to conduct a full investigation into a complaint of discrimination generally does not amount to an adverse action. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640 (10th Cir. 2012) ("[F]ailure to investigate an internal complaint cannot be considered retaliatory [because it] leaves an employee no worse off than before the complaint was filed."); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("[A]n employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."). Mr. Balderrama has not alleged that he was worse off after Ms. Parker and Ms. Heisler concluded their reviews and investigations than before he made his complaint.

Consequently, any deficiency in the investigation by Ms. Parker and Ms. Heisler was not an adverse action.

Mr. Balderrama also argues that Ms. Gadra retaliated against him by suggesting that he be excluded from the Denmark special recognition award team, asserting that "the jury was free to infer that . . . [Ms.] Gadra was retaliating against [Mr.] Balderrama for engaging in protected activity." If Mr. Balderrama had been excluded from the award, this may have constituted an adverse action. *See Passer v. American Chem. Soc'y*, 935 F.2d 322, 331-32 (1991) (cancellation of symposium honoring former employee, which humiliated him and made it more difficult to obtain new employment, constituted an adverse action). Here, however, Mr. Balderrama's superiors ultimately decided *not* to remove him from the award team. Accordingly, Ms. Gadra's suggestion did not constitute an adverse action.

Mr. Balderrama next points to Mr. Laurendeau's decision to place him on a PIP. This did not constitute an adverse employment action. The mere act of placing an employee on a PIP, without any other material consequences, does not constitute an adverse action. *See Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) (Placing employee on improvement plan was not a materially adverse action that would dissuade employee to forego exercising rights where the employee was not "deprived of responsibility, hours, pay, or any other relevant accoutrement of her position."). *Accord Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 n.2 (8th Cir. 2014) ("placement on the PIP alone does not constitute an adverse employment action and cannot support [the] claim of

-34-

retaliation"). As the United States District Court for the District of Columbia has explained:

> A PIP placement can constitute an adverse employment action where it exposes the individual to direct economic harm such as loss of salary, benefits, position, or promotional opportunities. *See Porter v. Shah*, 606 F.3d 809, 818 (D.C.Cir.2010). But the sole act of placing a plaintiff on a PIP without more does not constitute an adverse employment action. *Kelly v. Mills*, 677 F.Supp.2d 206, 222 (D.D.C.2010) ("The PIP placement itself had no effect on the terms or conditions of [plaintiff's] employment and thus was not 'materially adverse' because it did not cause a 'significant change in employment status.'").

*Bonnette v. Shinseki*, 907 F.Supp.2d 54, 71 (D.D.C. 2012). Here, Mr. Balderrama presented no evidence that he suffered any change in pay, hours, or responsibility as a result of being placed on the PIP.[16]

Accordingly, there was no adverse action prior to Mr. Balderrama's termination, which occurred on November 6, 2013. It is undisputed that the termination constituted an adverse action.

---

[16] Even if there was support for the argument that the PIP was a materially adverse action, Mr. Balderrama could not show that this had any bearing on the ultimate decision to include him in the RIF. Ms. Evans stated that, at the time Mr. Balderrama was included in the RIF, she did not know that he had been placed on a PIP, and the RIF tool admitted into evidence did not mention the PIP. Indeed, Mr. Balderrama argued to the jury, and in the brief filed in this case, that he was issued the PIP after the decision maker, Ms. Evans, decided that he would be included in the RIF. Although he was not ultimately terminated until weeks later, his theory of the case, presented to the jury and this Court, was that the decision to terminate him was made prior to his being placed on the PIP. Under this theory, the PIP could not have been a factor in his termination.

**Reason for Discharge**

Having established that Mr. Balderrama presented evidence that (1) he engaged in protected activity in May 2013, when he challenged his performance review on the ground that it was based on age and national origin discrimination, and (2) he suffered an adverse action when he was terminated six months later, in November 2013, we must address the reason for the termination. We must determine whether there was sufficient evidence to support the jury's verdict that the termination was in retaliation for protected conduct, i.e., that the protected activity was a "motivating factor" in Lockheed Martin's decision to terminate him. *Taylor*, 423 Md. at 658 (quoting *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 614 (2011)).

Pursuant to the *McDonnell Douglas* framework, after the circuit court rejected the argument that Mr. Balderrama had not made out a *prima facie* case, Lockheed Martin presented evidence of a non-discriminatory reason for the termination of Mr. Balderrama. It presented evidence that approximately 600 Lockheed Martin employees were terminated in a RIF due to budget concerns, and Mr. Balderrama was included in the RIF as one of the "low performers." This evidence was sufficient to meet Lockheed Martin's burden of showing a non-retaliatory reason for the adverse employment action. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 726 (6th Cir. 2012) (Generally, a reduction in force, coupled with a poor performance review, is a sufficient reason to justify termination.);

*Beaird v. Seagate Tech., Inc*., 145 F.3d 1159 (10th Cir. 1998) (reduction in force is a facially nondiscriminatory reason for decision to lay off the plaintiff).

Thus, the burden shifted to Mr. Balderrama to demonstrate that the non-discriminatory reason offered was not the true reason, but rather, it was a pretext for illegal discrimination based on retaliation. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). *Accord Edgewood*, 212 Md. App. at 199-200. The Supreme Court has stated that a plaintiff can meet his or her ultimate burden in this regard in one of two ways: (1) persuade the factfinder that "a discriminatory reason more likely motivated the employer"; or (2) show that "the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

In *Reeves*, 530 U.S. at 147-48, the Supreme Court addressed a situation where the plaintiff demonstrated pretext by showing that the employer's proffered explanation was false and "unworthy of credence." In that case, the plaintiff presented evidence that the reasons given for her firing, including shoddy record keeping and intentionally falsifying company pay records, were not true. *Id*. at 143-46. The Court stated that, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," and the factfinder could "consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id.* at 147 (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

Similarly, in *Edgewood*, 212 Md. App. at 200, this Court stated that pretext could be shown by "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Id.* (quoting *Nerenberg*, 131 Md. App. at 675). In that case, we held that the employee sufficiently rebutted the employer's proffered justification for transferring her to a new position by showing inconsistencies in the stated justification, which was sufficient to permit a jury to decide that the proffered legitimate reasons were "unworthy of credence" and that the employer did not "act for the asserted non-discriminatory reasons." *Id.* (quoting *Nerenberg*, 131 Md. App. at 675).

In a situation where the stated non-discriminatory reason for termination is an economically motivated RIF, an employee could show that this reason was "unworthy of credence" by producing evidence that there was not actually a RIF or that the employee's termination was not in accordance with the RIF criteria the employer used. *See Beaird*, 145 F.3d at 1168 (In a RIF case, one way a plaintiff can show pretext is to show that his or her "termination does not accord with the RIF criteria supposedly employed."). Mr. Balderrama makes no such claim in this case. There was undisputed evidence that there was an economically motivated RIF at Lockheed Martin resulting in hundreds of people losing their jobs when Mr. Balderrama was terminated, and Mr. Balderrama does not contend to the contrary. Nor does he dispute that, based on his poor performance

review, he was ranked the lowest performer in his group.[17] Mr. Balderrama presents no facts that disproved the reason given by Lockheed Martin for his termination or suggested that the reason given was false.

Neither did Mr. Balderrama produce evidence that the RIF criteria was not objectively based. *See id* at 1168 (a second way a plaintiff in a RIF case can show pretext is to produce evidence that the evaluation was deliberately falsified to effect his or her termination). Rather, the evidence presented was that RIF tool used to select the employees was objectively based, and there was no evidence that the criteria used in the RIF tool reflected in any way that Mr. Balderrama had filed a complaint alleging discrimination.[18] The evidence presented was that Mr. Balderrama was included in the RIF because he was a low performer, the worst in his group.

---

[17] That Mr. Balderrama or his co-workers thought he was doing a good job is irrelevant. *Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 679 (2000). It is the employer's assessment of the plaintiff's performance that is relevant in determining the legitimacy of a termination decision. *Id.* And the three annual performance evaluations that were included in the RIF criteria all occurred before the protected activity here.

[18] Mr. Balderrama does assert that the 2012 evaluation that was considered as part of the RIF process was based on discrimination. Although presenting evidence that an evaluation was manipulated by a supervisor with a discriminatory bias for the purpose of effecting the employee's termination is a possible way to show pretext, *see Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000), the "poison pill" concept that the circuit court discussed, Mr. Balderrama's assertion in this case does not establish pretext for two reasons. First, the circuit court dismissed the claim that the evaluation was improperly based on discrimination. Second, the evaluation occurred before the protected activity here, so it is irrelevant to the claim at issue, i.e., whether protected activity was a motivating factor in Mr. Balderrama's termination.

One court has stated that "[a] showing of pretext is more difficult to make in the context of a layoff where an employee's position is completely eliminated." *Grosz v. Boeing Co.*, 455 F.Supp.2d 1033, 1041 (C.D. Cal. 2006). We agree. Where there is an undisputed economic reduction in force, and the employer presents evidence that the employee was selected for termination due to poor performance, an employee must produce specific evidence supporting a finding of pretext, not mere speculation.

Here, Mr. Balderrama failed to produce such evidence. He did not present any evidence that the reason given, the RIF, was a pretext to hide a discriminatory termination motivated by his engaging in protected activity. Mr. Balderrama failed to present any evidence, beyond mere speculation, that would permit a reasonable jury to infer that his complaint about alleged discrimination motivated his termination.

Mr. Balderrama asserts that there was sufficient evidence adduced to allow a jury to conclude that Ms. Evans, who he agrees was the ultimate decision maker regarding who would be included in the RIF, was aware that he had filed a discrimination complaint, and the evidence shows that he was singled out for inclusion in the RIF. In making this argument, Mr. Balderrama implicitly concedes that evidence that Ms. Evans knew about his complaint of discrimination was critical. That makes sense. An employee generally cannot establish that his or her termination was in retaliation for protected conduct if the

person responsible for the termination decision was not aware of the protected conduct. *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410-11 (4th Cir. 2013).[19]

Even assuming, arguendo, that there was sufficient evidence to infer that Ms. Evans knew about the protected activity, that is not enough to show discrimination. *See Nerenberg*, 131 Md. App. at 670 (management's mere knowledge of employee's diabetes was not enough to support an inference of discrimination). Mr. Balderrama failed to produce any evidence, beyond speculation, that the RIF was not the reason for his termination, but rather, it was a pretext to hide a retaliatory termination motivated by his complaint about his performance evaluation. Under these circumstances, the evidence here was not sufficient to go to the jury. *See Gibson*, 160 F.3d at 182 ("'[A] jury may . . . not be allowed to infer [retaliation] from evidence that does no more than suggest it as a possibility.'") (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 245 (4th Cir. 1982)).

To hold otherwise would mean that an employee who receives a poor performance evaluation and is concerned that economically motivated layoffs are on the horizon need only file a complaint asserting that the evaluation was discriminatory, and the company is then subject to a lawsuit and a verdict against it. That is not the law. The employee must

---

[19] We note that Ms. Evans testified that, although she was aware that Mr. Balderrama had appealed his performance review, she was not aware that he had complained of discrimination. Given that testimony, the evidence supports a finding that Ms. Evans was not aware of the protected conduct, and her decision to terminate Mr. Balderrama could not have been in retaliation for that conduct. *But see Taylor*, 423 Md. at 664 (jury was entitled to disbelieve testimony by supervisor that she did not have notice of protected activity).

produce some evidence that the inclusion in the reduction of force was retaliatory, as opposed to performance based. Mr. Balderrama failed to do so in this case. Accordingly, the circuit court erred in failing to grant judgment in favor of Lockheed Martin.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.**