*Town of Riverdale Park v. Mamoun K. Ashkar, et al.*, No. 49, September Term 2020. Opinion by Hotten, J.

**CIVIL PROCEDURE – JUDGMENT NOTWITHSTANDING THE VERDICT – EMPLOYMENT DISCRIMINATION**

Following a jury verdict for the plaintiff that found employment discrimination on the basis of national origin, the circuit court granted a motion for judgment notwithstanding the verdict ("JNOV") in favor of the defendant. A motion for JNOV is reviewed "to determine whether it was legally correct, while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented." *Cooper v. Rodriguez*, 443 Md. 680, 706, 118 A.3d 829, 844 (2015) (citation and quotation marks omitted). "[I]f there is any evidence adduced, however slight, from which reasonable jurors[, applying the preponderance of evidence standard,] could find in favor of the plaintiff[,]" the motion for JNOV should be reversed. *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276, 285 (2005). The Court of Appeals applied the three-step, burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), and held that the grant of the motion for JNOV should be reversed because evidence of racial slurs directed at the plaintiff and made by an official overseeing the employment decision, coupled with no credible evidence supporting the defendant's purported nondiscriminatory reason for denying employment, was sufficient for a jury to find that the defendant intentionally discriminated on the basis of national origin.

**CIVIL PROCEDURE – REMAND – FURTHER PROCEEDINGS**

When an appellate court reverses a grant of a motion for JNOV, it may either reinstate the original verdict, remand the case for a new trial in accordance with a conditional order of the circuit court, or order a new trial. Md. Rule 2-532(f)(1). A verdict may be reinstated without the need of a new trial if there are only outstanding issues of law that must be addressed on remand. *See Bowden v. Caldor, Inc.*, 350 Md. 4, 47, 710 A.2d 267, 288 (1998). The Court of Appeals affirmed the judgment of the Court of Special Appeals that the jury verdict is to be reinstated with directions for the circuit court to conduct further proceedings as necessary to resolve two remaining questions of law relating to the defendant's alternative motion for a new trial pursuant to Md. Rule 2-533(c) and to the application of the liability "cap" pursuant to the Local Government Tort Claims Act, codified at Md. Code Ann., Courts and Judicial Proceedings § 5-303(a)(1) (1974, 2006 Repl. Vol.).

Circuit Court for Prince George's County
Case No. CAL 16-07777
Argued: April 12, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 49

September Term, 2020

_____

TOWN OF RIVERDALE PARK

v.

MAMOUN K. ASHKAR, ET AL.

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Hotten, J.

_____

Filed: July 15, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Mamoun K. Ashkar ("Ashkar"), a Palestinian-American and president of Greg's Towing ("Greg's"), brought suit against Petitioner, the Town of Riverdale Park, Maryland ("the Town")[1] and members of the Riverdale Park Police Department ("RPPD"), for claims that included intentional discrimination on the basis of national origin, in denying Greg's a municipal towing contract.[2]

The case proceeded to a five-day jury trial in the Circuit Court for Prince George's County. At the close of the evidence, the Town moved for judgment on the three remaining counts of discrimination, malicious prosecution, and tortious interference with a contractual relationship. Ashkar withdrew the tortious interference claim, and the circuit court granted the motion in favor of the malicious prosecution claim, but reserved ruling on the discrimination claim, sending that claim to the jury.

The jury found in Ashkar's favor on the discrimination claim and awarded $244,212 in damages and $15,000 in non-economic damages. The Town moved for judgment notwithstanding the verdict ("JNOV"), which the circuit court granted, citing Ashkar's lack of "direct evidence" of discrimination, lack of circumstantial evidence of discrimination that could be imputed to the Town, and no evidence of language "which would demean the inherent dignity of any person[]" pursuant to Prince George's Cty., Md., Code of Ordinances subtit. 2, div. 12, subdiv. 8, ("Prince George's Cty. Code") § 2-229(a)(3).

---

[1] We also sometimes refer to The "Town" to include Town administrators and individual members of the RPPD as co-defendants until their dismissal during trial.

[2] The other claims included malicious prosecution, tortious interference with prospective advantage, civil conspiracy, antitrust violations, and retaliation.

Ashkar appealed the dismissal of the malicious prosecution claim and the grant of the motion for JNOV to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals affirmed the dismissal of the malicious prosecution claim, but the panel split 2-1 in reversing the grant of the motion for JNOV. The majority held that Ashkar presented sufficient evidence such that a jury could reasonably conclude that the Town offered a pretextual reason for denying the towing contract based on national origin. The Town timely appealed to this Court.

We granted *certiorari* on February 8, 2021, *Town of Riverdale Park v. Ashkar,* 472 Md. 5, 243 A.3d 1199 (2021), to address the following questions:

1. Did [the Court of Special Appeals] err in reversing the [circuit] court's ruling that [Ashkar] had failed to prove that [the Town's] business decision was pretextual and not based on discrimination?

2. Did [the Court of Special Appeals] err in directing that the case be remanded so that the jury's verdict could be reinstated, where the [circuit] court expressly ruled that [Ashkar] had failed to prove damages in any non-speculative manner, and where the verdict is, in any event, subject to a statutory cap lower than the amount of the verdict?

We answer both questions in the negative and shall affirm the judgment of the Court of Special Appeals.

## FACTS AND PROCEDURAL BACKGROUND

### Underlying Incident

The following background comes from testimony and exhibits adduced at trial. We note at the outset that when we review the circuit court's "decision to grant a defendant's motion for judgment notwithstanding the verdict, an appellate court must view the evidence in the light most favorable to the plaintiff and resolve all conflicts in the plaintiff's favor."

2

*Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 666, 607 A.2d 8, 9 (1992) (citing *Lehman v.* [*Balt.*] *Transit Co.*, 227 Md. 537, 540–41, 177 A.2d 855, 857 (1962)). "Therefore, we present the facts of the case from [Ashkar's] point of view." *Id.*, 607 A.2d at 9.

The Town was incorporated in 1920 as the "Town of Riverdale" and changed its name to the "Town of Riverdale Park" in 1998.[3] The Town's Charter specifies the general power of the Town to enact ordinances on behalf of the town. Town of Riverdale Park, Md., Charter, art. III, § 301.

> Exercise of Powers. For the purpose of carrying out the power granted in this charter, the council may pass all necessary ordinances. All the powers of the town shall be exercised in the manner prescribed by this charter, or if the manner is not prescribed, then in such manner as may be prescribed by ordinance. . . .

Town of Riverdale Park, Md., Charter, art. III, § 303.

In 1962, the Town, pursuant to Article III of its charter,[4] enacted an ordinance that required all businesses operating in the Town to apply for and receive a business license.

---

[3] The Town's origins date back to 1800, when Henri Joseph Stier emigrated from Belgium and purchased 729 acres of woodlands and farmland near the newly formed Washington, D.C. Riverdale Park, *Town History* (2019) http://www.riverdaleparkmd.info/our_town/explore_town_of_riverdale_park/1800_s.php, archived at https://perma.cc/HU6R-H6VB. Ashkar's family emigrated from Palestine and moved to Prince George's County in 1975 where Ashkar was born. Ashkar identifies as a first generation American and as a Palestinian.

[4] Article III, section 302 of the Town Charter provides in pertinent part:

**Licenses.** Subject to any restriction imposed by the State of Maryland, to license and regulate all persons beginning or conducting transient or permanent business in the town for the sale of any goods, wares,

<span style="float: right;">(continued . . . )</span>

Town of Riverdale Park, Md., Code § 42-4.  The Town's ordinances do not impose any specific requirement to operate a towing business within municipal limits, but gives the RPPD the "authority to impound and remove [any] vehicle [left unattended in violation of any law, ordinance or order] and charge the owner thereof the costs of towing, storage, and any other charges incurred in connection therewith."  Town of Riverdale Park, Md., Code § 64-15.

The Town Charter specifies that purchases, including towing contracts, shall be made subject to the approval by the mayor and town council:

Purchasing and Contracts:

(a) All purchases, contracts, and/or expenditures for the town shall be made by the town administrator and/or specified individuals subject to approval of the mayor and council.  All bills for purchases, contracts, and/or expenditures shall be approved by the mayor and responsible council members, committees, and administrative personnel *by whatever procedure established from time to time by the mayor and council.*

\*\*\*

 (d) Any and all other rules and regulations pertaining to purchasing and contracts . . . *shall be prescribed by ordinance or resolution by the mayor and council at a regular or special public meeting.*

Town of Riverdale Park, Md., Charter, art. VI, § 622 (emphasis added).

Neither party made the Court aware of any resolutions or ordinances that specifically address the procurement of towing contracts.[5]  The record also provides no

---

(. . . continued)
> merchandise, or services; to license and regulate any business. . . [;] to establish and collect fees and charges for all licenses and permits issued under the authority of this charter.

[5] The lack of resolutions and ordinances addressing the procurement of towing

(continued . . .)

indication of any written policy or procedure from the mayor, the Town council, or the RPPD addressing or directing the acquisition of a towing services.[6] The record also omits

---

(. . . continued)

services contrast with the Town's contemporaneous extensive public record of Town council actions concerning other local procurement matters. For example, in 2011, the Town council passed a resolution, signed by Mayor Vernon Archer and Town Administrator Sarah Imhulse, directing the Town "to create a [Request for Quote] for a Planning Consultant." Council Res., 2011-R-22 (Sept. 6, 2011). "[T]he Town [] must ensure that it has the best planning advice available and that the *procurement* of those consulting resources is done in [a] *careful and deliberate manner*[.]" *Id.* (emphasis added).

[6] On July 1, 2013, pursuant Town of Riverdale Park, Md., Ordinance 2013-OR-05 (July 1, 2013), the Town repealed and replaced the Personnel Policy Manual with a revised version, effective July 21, 2013. The Personnel Policy Manual guides employment conduct for the Town and applies to hiring and contractors. The manual provides the following:

> **C-2. Recruitment.** It shall be the policy of the Town to provide fair and equal opportunity to all qualified persons to enter Town employment on the basis of demonstrated merit and fitness determined by fair and practical methods of selection, without regard to . . . national origin or ancestry[.]
>
> **C-3. Qualifications for Employment.** Each applicant shall complete a job application . . . as required by the Town Administrator. . . . All applicants for any position with the Town shall meet the *minimum qualifications established for that position*.
> ***
> **L-1. Coverage and Distribution of Policy.** . . . [T]his Article L applies to all officers and employees of the Town including . . . employees working under contract for the Town.
> ***
> **L-3. Unlawful Discrimination or Harassment.** . . . As used in this Section the term "unlawful discrimination or harassment" refers to any alleged discrimination disparate treatment or harassment against an employee on the basis of . . . national origin[.] . . . Acts of unlawful harassment and or/discrimination towards an employee include, but are not limited to: [] Verbal conduct such as *epithets, derogatory comments, slurs*[.]
> ***

(Emphasis added.)

any indication of the Town's incorporation by reference to any law requiring a tow company to seek approval from Prince George's County Towing Services Program because such a requirement was not enacted until 2018.[7]

Greg Prendable founded Greg's in 1974 and formally incorporated the business in Maryland in 1986. Greg's is located near the center of the Town. From 1974 to 2013, Greg's provided uninterrupted towing and vehicle storage services to the Town and surrounding communities. To this day, Greg's remains the only towing and storage lot within Town limits.

Prendable had maintained a towing agreement with the RPPD.[8] Prendable or one of his employees would retrieve illegally parked, wrecked, or otherwise disabled vehicles and could store these vehicles within Greg's secured facility. Sometime prior to March 2013, Prendable determined that he would sell his towing business and retire. Ashkar testified that he first heard of the sale of Greg's in "early 2013[,] . . . probably February/March." The Town became formally aware that Prendable was selling Greg's, at the latest, on May 8, as reflected in a memorandum from Town Administrator Imhulse

---

[7] The General Assembly amended Md. Code Ann., Transportation § 16-303.1 and 25-115 to expressly require Prince George's County and its police department to use open solicitation when procuring the services of a private tow company. Prince George's County issued its solicitation on January 11, 2019. Prior to the legislative enactment, Prince George's County Police Department maintained its own application process, *see infra* page 7, but it was not codified in statute or ordinance. *See* Prince George's County, Md., Code of Ordinances subtit. 5, div. 21, § 5-265 (requiring a towing license from the Department of the Environment, not the Prince George's County Police Department).

[8] The agreement was apparently reduced to writing at some point, but it was not included in the record.

to Mayor Archer, RPPD Chief David C. Morris, and Public Works Director Leonard Addison that stated "we have heard that [Greg's Towing] may be up for sale. It may be a good idea for the Town to look into purchasing the property."

Prendable received bids from AlleyCat Towing and Recovery ("AlleyCat"), Five Star Towing, owned by Ashkar and his three brothers,[9] and one other company. AlleyCat offered the highest bid, and Prendable accepted.

On October 29, 2013, Assistant Chief of Police, Lieutenant Colonel Patrick G. Timmons, sent a letter on official RPPD letterhead, denoting David C. Morris as Chief of Police, to Charles Heidenberg, owner of AlleyCat, stating that "*we* desire AlleyCat [] begin towing for *us* on November 1, 2013," on an interim basis subject to future contract negotiations. (Emphasis added.) On October 31, 2013, Greg's stopped towing for the Town. According to Ashkar's testimony, the RPPD was under the assumption that AlleyCat would eventually complete the acquisition of Greg's.

On October 29, 2013, Prendable communicated to the Prince George's County Police Department that his towing license with the county would expire October 31, 2014, and he would no longer provide towing services. With impending retirement, Prendable intended for Greg's membership with the Prince George's County Police Department Authorized Tow Services Program ("Tow List") to lapse. Ordinarily, a towing company must apply for and/or renew membership to the Tow List every two years. The application for the 2014–15 Tow List membership was due November 2013. After Prendable secured

---

[9] Ashkar and his three brothers continue to co-own Five Star Towing. Ashkar's brothers did not join him in the lawsuit.

7

a bid for his business, he belatedly submitted his application for the 2014–15 Tow List on June 6, 2014.  His application was untimely, so it was placed in a pending file, should the Prince George's County Police Department need to immediately expand towing capacity before the next Tow List cycle.

The Town's witness, Lieutenant Macherko from the Prince George's County Police Department Towing Coordination Unit, testified that Greg's was fully qualified to be on the Tow List, but for its belated submission: "Q: And at no point did you receive any information that Greg's was no longer qualified to be on the list, is that correct? [Macherko:] That's correct."  Apart from the lapse in 2014 due to Prendable's retirement, Greg's maintained membership on the Tow List before and after the 2014–15 cycle.

AlleyCat never completed the purchase of Greg's, so Prendable offered to sell the business to Ashkar and his brothers, who had operated Five Star Towing in Prince George's County since 2009.  Ashkar was interested in purchasing Greg's because he knew that the Town's towing service exclusively ran through Greg's.  Ashkar learned of the Town's exclusive dealings with Greg's after Ashkar had approached the RPPD in 2011 to inquire whether the Town would extend its towing business to Five Star Towing.  Lieutenant Colonel Timmons informed Ashkar, "there's no way [that's] possible, they've been using Greg's [] for a very long time, they do not plan on changing, using anyone other than Greg's[.]"  According to Ashkar's testimony, Greg's operated as the Town's exclusive towing provider because it was the only towing company with a storage lot within

municipal limits, and the RPPD was not willing to use a towing company located outside of the municipal limits.[10]  Lieutenant Timmons informed Ashkar:

> We are not sending our officers to conduct [] investigations -- if something is wrong with the vehicle, we have to send our officers all the way to Beltsville to check the vehicle or conduct the investigation.  We have a tow yard in Riverdale.  That's the only location that's authorized to tow for the [RPPD].

Ashkar also visited the Town Hall, on at least two occasions, to discuss towing services and was informed that "only Greg Prendable *or the person operating* [*Greg's*] would be eligible to receive Town business because it was the only lot within Town limits." The Town formally codified its preference for local businesses, like Greg's Towing, when it passed a resolution establishing a local business purchasing policy that went into effect on May 5, 2014.  Town Council Res., 2014-R-06 (May 5, 2014) ("The Town [] reserves the right to show preference to local bidders in the purchase of supplies, equipment and services. . . .  A 'local bidder' is defined as an individual or business who maintains a place

---

[10] According to Ashkar, zoning laws prevent another tow yard from opening within municipal limits: "our office was located, for Five Star Towing in Riverdale, but our tow yard was located in Beltsville . . . you cannot open another tow yard in Riverdale.  The zoning will not permit you."  Town of Riverdale Park, Md., Code § 42-8(c) requires businesses to comply with all zoning laws.  The zoning for the Town mostly limits structures to either residential homes or mixed-use town center developments, which are designed to "promote reinvestment in, and the appropriate redevelopment of, older commercial areas, to create attractive and distinctive community centers for shopping, socializing, entertaining, living, and to promote economic vitality."  Prince George's County, Md. Code of Ordinances subtit. 27, pt. 10, div. 2, subdiv. 3 § 27-546.09 (1994). *See also* The Maryland-National Capital Park and Planning Commission, PGAtlas, https://www.pgatlas.com (last visited May 28, 2021), archived at https://perma.cc/QHA9-4EDW.

of business or maintains an inventory of merchandise and/or equipment in the incorporated municipal boundaries of the Town [], is licensed by the Town[.]").

Ashkar purchased Greg's for $87,853, and on March 27, 2014, Ashkar moved into Greg's office, and became the "face" of the company. Ashkar explained in his testimony that at this point he was running towing and business operations, but had not become the president because of outstanding paperwork.[11] After Ashkar assumed control of business operations of Greg's, he approached the RPPD in late March 2014 to discuss the continuation of Greg's as the Town's exclusive towing provider. Ashkar spoke with Lieutenant Colonel Timmons, who appeared surprised that Ashkar had purchased Greg's, based on his belief that Prendable had sold the towing company to AlleyCat. Ashkar reminded Lieutenant Colonel Timmons of their previous conversation regarding Greg's as the Town's exclusive towing provider. Ashkar requested that the contract with Greg's and the Town continue. Lieutenant Colonel Timmons rejected Ashkar's request. According to Ashkar's testimony, Lieutenant Colonel Timmons stated that "he just couldn't see kicking out AlleyCat and giving [Ashkar] the contract."

Following the March 2014 visit to the RPPD, Ashkar returned to the police station to schedule an appointment with Chief Morris to discuss the towing contract. While Ashkar was asked to wait in the lobby, he overhead Lieutenant Colonel Timmons,

---

[11] Ashkar became an officer of Greg's on April 15, 2014. The purchase did not become final until January 1, 2015. Ashkar currently serves as the president, which he testified as the individual charged with generating business and being the public face of the company. His brother, Aman, runs the day-to-day operations, while the two youngest brothers fill in as needed.

10

Lieutenant Robert Turner, in charge of day-to-day towing issues for the RPPD, and RPPD Office Manager, Anna Wendland, discussing how to "get rid of him." Ashkar heard Lieutenant Colonel Timmons state that "somebody needs to tell that camel jockey he isn't towing for Riverdale." Ashkar also overheard Lieutenant Colonel Timmons state that "this fucking camel jockey doesn't get the point."

Lieutenant Turner came to speak with Ashkar and instructed Ashkar to follow him into an interview room. Lieutenant Turner stood over Ashkar and began "telling [Ashkar] that [he] do[es]n't understand [] what [Ashkar's] doing here, that Timmons is in charge and [Ashkar is] never going to get the contract." When Ashkar explained his purpose in scheduling an appointment with Chief Morris, according to Ashkar, Lieutenant Turner stated "there's no need to see the chief of police, Timmons is in charge, you're not going to get the contract, stop bothering us and don't come back here." When Ashkar began to write down Lieutenant Turner's badge number, Lieutenant Turner said, "I'm just taking orders from Timmons."

According to testimony from Lieutenant Colonel Timmons, Chief Morris directed him to "deal with [] Ashkar." Chief Morris, pursuant to the Town Code, may delegate his authority and responsibility for administering the department to officers and other personnel. Town of Riverdale Park, Md., Code § 53-10(a) ("The Chief of Police is the commanding officer and administrative head of the Police Department. He shall have the *authority to delegate responsibility and assign functions to officers and personnel of the Department* in such manner as in his judgment is necessary to establish and maintain efficiency and good administration.") (emphasis added).

11

Ashkar testified that after being rebuffed by Lieutenant Colonel Timmons in late March 2014, he attended "numerous town meetings [] since I saw there was a lot of confusion, to clarify to everyone that Greg's [] is still in business . . . we definitively want the contract for the towing department in Riverdale[.]" There is at least one documented instance of Ashkar attending a Town meeting for this purpose on July 21, 2014. The minutes of this meeting state: "Public Comments[:] Mike Ashkar with Greg's [] stated that his company was interested in providing tow service to the Town." Throughout the summer and fall of 2014, Ashkar unsuccessfully attempted to contact other Town officials in person and by email, including Chief Morris, about the towing contract with the Town.

On July 22, 2014, Chief Morris received a proposal from AlleyCat to continue as the Town's exclusive towing provider. In the application, AlleyCat stated that it was founded in 2000, was located in Hyattsville, MD, and had provided towing services to the Town since November 1, 2013 (approximately eight months at the time). The application listed AlleyCat's compliance with all regulations and licensing requirements by Prince George's County and Maryland. The application did not ask for, and AlleyCat did not stipulate, membership on the Tow List.

On September 19, 2014, Ashkar finally received notification from RPPD Office Manager Wendland, which copied Lieutenant Colonel Timmons, that Greg's could submit a formal bid to become the Town's towing provider. Ashkar timely submitted the application. The application, like AlleyCat's application, did not present the Tow List as one of the requirements or qualifications. Ashkar followed up with the RPPD about the status of the application, but received no response after multiple attempts.

12

Ashkar reported the racial slurs used against him by the RPPD to Sergeant Richard Sease of the University Park Police Department and Treasurer of the Maryland Lodge Fraternal Order of Police 9 ("FOP"). Ashkar developed a relationship with Sergeant Sease while providing towing services through Five Star Towing to the University Park Police Department. At the time, Sergeant Sease also oversaw the investigative committee for the FOP, which examined and mediated complaints made against police officers.

On January 17, 2015, Sergeant Sease contacted Sergeant Sommerville, a trusted colleague at the RPPD, to discuss Ashkar's claim of discrimination. Ashkar was present and listening on speakerphone. In response to Sergeant Sease's inquiry about Greg's, Sergeant Sommerville stated: "no, no, no, don't use this company, Mike [is] not his real name,[12] these guys can't pass a background check and pretty much he's a foreigner and just stick with -- we've got to stick together." Sergeant Sease's testimony corroborated Ashkar's recollection of the conversation: "I looked at [] Ashkar and I said there's something wrong with this, and something is going on more than just you not being able to do business in the Town of Riverdale [Park]."

Ashkar emailed Chief Morris on January 21, 2015 to share his concerns about the status of the towing application. Having received no response from Town officials, Ashkar retained legal representation. On February 4, 2015, Ashkar's attorney sent a letter addressed to Mayor Archer, which copied Chief Morris, expressing concerns over discriminatory comments and lack of "equal, fair and appropriate" treatment of Ashkar's

---

[12] Ashkar uses Mike as a nickname.

bid for the towing contract. At some point in February 2015, Chief Morris met with Mayor Archer and delivered his formal recommendation that the Town award AlleyCat the towing contract. Chief Morris based his recommendation on reports that AlleyCat had so far provided "high quality of service[;]" it had operated in the area for many years; and it was on the Tow List, thus it had been vetted by Prince George's County Police Department.

In his testimony at trial, Chief Morris stated there was no written policy requiring inclusion on the Tow List to qualify as the Town's towing provider. Mayor Archer, in his testimony, contradicted Chief Morris and suggested there was a written policy: "we need a clearly written, stated town policy and follow it. . . . [The policy] would be in the police's records and I believe they would also be in the town archives." No written policy referring to the Tow List or general cooperation with the Prince George's County Police Department was introduced into evidence.[13] Chief Morris admitted in his testimony, that to his knowledge, there is no formal document signed by any Town official, other than the letter signed by Lieutenant Colonel Timmons in 2013 provisionally granting the tow contract to AlleyCat, that awarded the towing contract on a permanent basis.

---

[13] We note that the Town has formally collaborated with Prince George's County in providing services on behalf of its constituents, but there was not a similar record of official cooperation with Prince George's County regarding the Tow List. *See, e.g.*, Town Council Res., 2012-R-02 (Mar. 5, 2012) ("For the purpose of authorizing the Town [] to participate in joint negotiations with other Prince George's County and other municipalities for the renewal of the Town's cable franchise with Comcast of Maryland, Inc.; and matters generally related thereto."); Town Council Res., 2011-R-18 (June 20, 2011) (approving a Town "Cooperation Agreement" with Prince George's County regarding participation in the Community Development Block Grant and HOME Investment Partnership program).

## A. Circuit Court

Ashkar brought suit against the Town, Mayor Vernon Archer, Town administrators, and members of the RPPD, resulting in a five-day jury trial from May 14 to May 19, 2018. Ashkar alleged incidents of discrimination based on his national origin, malicious prosecution, tortious interference with prospective advantage, civil conspiracy, antitrust violations, and retaliation.

Following a motion for summary judgment, stipulation, and consent, the circuit court dismissed all of the defendants except the Town. Also, through summary judgment and consent of the parties, the circuit court dismissed all counts apart from discrimination and malicious prosecution.

At the close of Ashkar's case, the Town moved for judgment[14] pursuant to Md. Rule 2-519.[15] The circuit court granted the motion as to the count of malicious prosecution, but

---

[14] The Town motioned for judgment on counts one (discrimination), two (malicious prosecution), and five (tortious interference with prospective advantage), however, the circuit court noted that count five was already dismissed by consent of the Town.

[15] Maryland Rule 2-519 provides in pertinent part:

A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence.

***

In a jury trial, if a motion for judgment is made at the close of all the evidence, the court may submit the case to the jury and reserve its decision on the motion until after the verdict or discharge of the jury. For the purpose of appeal, the reservation constitutes a denial of the motion unless a judgment notwithstanding the verdict has been entered.

reserved judgment on the count of discrimination, and sent the count of discrimination against the Town to the jury to deliberate. The motion for judgment did not include the issues of excessive damages or remittitur later raised by the Town in a post-verdict motion for a new trial.

The Town requested and the jury received the following instruction regarding the Town's defense of the business judgment rule against the claim of discrimination:

> In determining whether the Town of Riverdale Park's[,] through its employees or agents, stated reason for its action was a pretext for discrimination, you may not question the Town of Riverdale Park's business judgment. Pretext is not established just because you disagree with the business judgment of the Town of Riverdale Park, unless you find that the Town of Riverdale Park['s,] through its employees or agents, reason was a pretext for discrimination.

> Even if the Town of Riverdale Park is mistaken and its business judgment is wrong, an employer is entitled to make its own policy and business judgments. The Town of Riverdale Park, through its employees and or agents, may make those business decisions as it sees fit, as long as it is not pretext for discrimination.

The jury returned a verdict on the discrimination claim in favor of Ashkar and awarded compensatory damages in the amount of $244,212 and non-economic damages in the amount of $15,000.

Following the verdict, the Town filed a motion for JNOV, or in the alternative, the Town requested a new trial pursuant to Rule 2-533.[16] The Town also alternatively moved

---

[16] Maryland Rule 2-533(c) provides in pertinent part:

Any party may file a motion for new trial within ten days after entry of judgment. A party whose verdict has been set aside on a motion for judgment notwithstanding the verdict or a party whose judgment has been amended on

(continued . . .)

16

for the circuit court to grant a remittitur for one dollar in nominal damages, or to reduce

judgment to $200,000 pursuant to the limitation on damages provided in the Local

Government Tort Claims Act ("LGTCA").[17]

In the hearing on the motion for JNOV, the circuit court dismissed the possibility

for a new trial:

> [COUNSEL for the Town]: Now, we are going to talk about when we get to the motion for new trial . . .
>
> THE COURT: *I can just tell you all now there will be no new trial. There is not going to be a new trial.*
>
> [COUNSEL for the Town]: Okay.
>
> THE COURT:  I will either -- *I will decide the motion but we are not having a new trial. . . .*  I am just saying.

(Emphasis added).

---

(. . . continued)

> a motion to amend the judgment may file a motion for new trial within ten days after entry of the judgment notwithstanding the verdict or the amended judgment.
>
> \*\*\*
>
> When a motion for new trial is joined with a motion for judgment notwithstanding the verdict and the motion for judgment notwithstanding the verdict is granted, *the court at the same time shall decide whether to grant that party's motion for new trial if the judgment is thereafter reversed on appeal.*

(Emphasis added).

[17] The version of the LGTCA at issue in this appeal was codified at Md. Code (1974, 2006 Repl. Vol.), §§ 5-301–304 of the Courts & Judicial Proceedings Article ("Cts. & Jud. Proc."). The LGTCA has since been amended and raised the maximum liability limit to $400,000 per individual claim. Cts. & Jud. Proc. § 5-303(a)(1) (1974, 2015 Repl. Vol.).

The circuit court appeared persuaded by the Town's argument that the verdict should be capped at $200,000: "THE COURT: Well, I am persuaded that the cap applies. If nothing else, I think the cap does apply based on what I have read and what you have argued in writing. So, that was not going to be an issue for me."

The circuit court granted the motion for JNOV in favor of the Town. The circuit court determined that Ashkar "provided no direct evidence of discrimination on behalf of The Town." According to the circuit court, Ashkar's primary argument in support of the discrimination claim arose from the alleged malicious prosecution by the Town.[18] The malicious prosecution claim was not before the jury to decide, and the decision to use AlleyCat predated the actions that gave rise to the alleged malicious prosecution.

The circuit court also found that because the Town's agents were dismissed during the proceedings, there was no basis to impute discriminatory animus to the Town. The circuit court also found no evidence of language "which would demean the inherent dignity of any person[]" pursuant to Prince George's Cty. Code § 2-229(a)(3)—the statutory basis for Ashkar's claim of discrimination.

---

[18] During trial, the jury heard testimony regarding a contentious interaction between Ashkar and the RPPD on April 25, 2015. Ashkar responded to a private tow request following an accident within Town limits. When Ashkar arrived, he informed Sergeant Sommerville that he intended to tow the vehicle as requested. Sergeant Sommerville told Ashkar, "he doesn't give a goddamn if he is going to tow that car or not, to get the fuck out of here." Ashkar left without towing the vehicle. Sergeant Sommerville reported the interaction with Ashkar to Lieutenant Turner and Lieutenant Colonel Timmons. The following day, Chief Morris recommended criminal charges to be filed against Ashkar: disturbing the peace and hindering passage; and obstructing and hindering an investigation. Both charges were entered *nolle prosequi* on August 11, 2015.

18

In the final paragraph of the memorandum and order, the circuit court explained, in the alternative, why Ashkar would not be entitled to relief. The circuit court found that Ashkar provided insufficient evidence for the jury to determine damages because the proffered expert testimony failed to accurately estimate Ashkar's income derived from his ownership of Greg's. The circuit court, despite its critique of the basis for the award of damages, did not include in its memorandum and order any statement regarding a new trial or remittitur.

## B. The Court of Special Appeals

The Court of Special Appeals reversed the grant of the motion for JNOV, but the Court affirmed the dismissal of the claim for malicious prosecution.[19] *Ashkar v. Town of Riverdale Park*, No. 2714, Sept. Term, 2018, 2020 WL 4371289 at *6 (Md. Ct. Spec. App. Jul. 30, 2020). The Court remanded the case to the circuit court with direction to reinstate the jury verdict. *Id.* at *8. The Court declined to address the Town's alternative argument that a motion for a new trial or remittitur should be granted, because the Town waived these arguments by not raising them in the motion for judgment. *Id.* at *3 n.4.

According to the Court, Ashkar presented his employment discrimination claim under Prince George's Cty. Code § 2-229, which provides a private right of action under Md. Code Ann., State Government ("State Gov't") § 20-1202. *Id.* at *4. The Court primarily considered Ashkar's claim under Title VII of the Civil Rights Act, which, in

---

[19] Ashkar did not renew the issue on cross-petition.

relevant part, does not permit employers to refuse to hire an individual because of the individual's national origin. *Id.* (citing 42 U.S.C. § 2000e-2(a)(1)).[20]

According to the Court, Ashkar had the burden of persuading the jury that he had been the victim of discrimination. *Id.* While Ashkar could have presented his case either through direct or circumstantial evidence, the Court confined its analysis to whether Ashkar satisfied his burden of proof through circumstantial evidence. *Id.* at *5–6.

Ashkar needed to satisfy a four-part test to establish a *prima facie* case of employment discrimination: "(1) he/she was a member of a protected class, (2) he/she applied and was qualified for the position for which the employer was seeking applicants, (3) despite his/her qualification, he/she was rejected and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Id.* at *4 (quoting *Muse-Ariyoh v. Bd. of Educ. of Prince George's Cty.*, 235 Md. App. 221, 243, 175 A.3d 886, 899 (2017)). Even though Ashkar "struggled" with adducing admissible evidence of discrimination from municipal leaders, the Court of Special Appeals concluded that Ashkar established a *prima facie* case of discrimination. *Id.* at *5. Ashkar

---

[20] 42 U.S.C. § 2000e-2(a) provides in pertinent part:

It shall be an unlawful employment practice for an employer--

> (1) *to fail or refuse to hire* or to discharge *any individual, or otherwise to discriminate against any individual with respect to* his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or *national origin*[.]

(Emphasis added.)

demonstrated that, as a Palestinian-American, he was a member of a protected class. He demonstrated his objective qualifications and experience to continue as the Town's towing service provider because he had a tow lot in town; he was the owner of the business that provided exclusive towing services for thirty years; and he provided towing services for other towns and organizations. *Id.* at *6. He showed that the Town denied renewing Greg's contract, despite being aware of Ashkar's qualifications and credentials. *Id.*

After Ashkar established a *prima facie* case of discrimination, the burden shifted to the Town to offer a non-discriminatory reason for the contested employment decision. *Id.* at *5. The Court acknowledged the non-discriminatory reason provided by the Town. *Id.* According to the Town, Greg's membership on the Tow List had lapsed and the Town used its business judgment to select another towing provider from the Tow List. *Id.* The main issue for the Court concerned whether Ashkar, despite the non-discriminatory reasons advanced by the Town, demonstrated that the Tow List was a pretext and that the employment discrimination was a product of unlawful discrimination. *Id.* at *6.

The Court reasoned that Ashkar met his burden of persuasion based on evidence of Lieutenant Colonel Timmons using a racial slur while concurrently being involved, if not "a significant influencer[,]" in denying Greg's bid for the towing contract. *Id.* at *5. The Court was also persuaded by Ashkar's argument that the Town's business justification was pretextual because there was no written policy relating to the Tow List that could have impacted the Town's decision. *Id.* at *6.

Viewing the facts in a light most favorable to Ashkar, the Court of Special Appeals concluded that a jury could come to the reasonable conclusion that the Tow List and

21

selection of AlleyCat was a pretext for denying Ashkar the contract based on race. *Id.* at *7. The dissent would have affirmed the grant of the motion for JNOV by the circuit court, arguing that Ashkar failed to offer competent evidence that rose above speculation, hypothesis, and conjecture. *Id.* at *8 (Shaw Geter, J., dissenting) (citing *Cooper v. Rodriguez*, 443 Md. 680, 706, 118 A.3d 829, 844 (2015)) (quotation omitted). The Town timely appealed to this Court.

## DISCUSSION

### Standard of Review

A party may only file a motion for JNOV "if that party made a motion for judgment at the close of all evidence and only on the grounds advanced in support of the earlier motion." Md. Rule 2-532(a). We review the grant of a motion for JNOV "to determine whether it was legally correct, while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party, and determining whether the facts and circumstances only permit one inference with regard to the issue presented." *Cooper*, 443 Md. at 706, 118 A.3d at 844 (citations and quotation marks omitted). "[I]f there is any evidence adduced, however slight, from which reasonable jurors[, applying the preponderance of evidence standard,] could find in favor of the plaintiff on the" discrimination claim, the grant of the motion for JNOV must be reversed. *Hoffman v. Stamper*, 385 Md. 1, 16, 867 A.2d 276, 285 (2005). We have described this slight amount of evidence as whether "the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the judgment notwithstanding the verdict should be denied." *Cooper*, 443 Md. at 706, 118 A.3d at 844 (citations omitted).

22

Maryland Rule 2-532(f)(1) prescribes the scope of subsequent proceedings if an appellate court reverses the grant of a motion for JNOV:

> *When Judgment Notwithstanding the Verdict Granted.* If a motion for judgment notwithstanding the verdict is granted and the appellate court reverses, it may (A) enter judgment on the original verdict, (B) remand the case for a new trial in accordance with a conditional order of the [circuit] court, or (C) itself order a new trial. If the [circuit] court has conditionally denied a motion for new trial, the appellee may assert error in that denial and, if the judgment notwithstanding the verdict is reversed, subsequent proceedings shall be in accordance with the order of the appellate court.

### The Contentions of the Parties

The Town argues that the motion for JNOV should be affirmed because Ashkar failed to establish a *prima facie* case of employment discrimination and, alternatively, Greg's lapsed membership on the Tow List was not a pretextual reason for denying employment. The Town urges us to adopt a more stringent standard for a *prima facie* case of discrimination. The Town cites *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096 (1981), for the proposition that a prospective employee cannot establish a *prima facie* case of discrimination if the prospective employee's objective qualifications are not equal to or better than an applicant from a non-protected class. By applying this proposition to the instant case, the Town argues it is not required to hire Ashkar, who failed to demonstrate objective qualifications equal to or better than AlleyCat. The Town argues that the Tow List provided an objective and decisive selection criterion, and at the time, AlleyCat was on the Tow List, which made it the superior choice compared to Greg's, whose membership had lapsed. The failure to present qualifications equal to or

23

better than AlleyCat negated Ashkar's *prima facie* case of employment discrimination. According to the Town, the motion for JNOV should have been granted on this basis alone.

Even if Ashkar demonstrated a *prima facie* case of discrimination, the Town asserts that Ashkar failed to demonstrate that the use of the Tow List was a pretextual reason for denying employment. In *Lockheed Martin Corp. v. Balderrama*, a terminated employee sued for employment discrimination based on his national origin. 227 Md. App. 476, 134 A.3d 398 (2016). The Court of Special Appeals concluded that the plaintiff failed to present evidence that the reason for his termination was pretextual when the employer downsized due to undisputed economic conditions and selected the plaintiff for termination due to poor performance. *Id.* at 514–15, 134 A.3d at 420.

The Town contends that, similar to the plaintiff's failure in *Balderrama* to demonstrate that economic conditions and poor job performance were pretextual reasons for the adverse employment decision, Ashkar failed to show that the Tow List was a pretextual reason for denying employment. The Town "always has used a company on the Tow List[]" because it enabled the Town to save time and money by outsourcing the vetting of contractors to a larger and better resourced governmental entity. Greg's was not on the Tow List for the 2014–15 cycle, whereas at the time of Prendable's retirement, AlleyCat was on the Tow List.

The Town further rejects any basis that the decision to reject Ashkar's employment was grounded in or affected by discriminatory animus. According to the Town, the only competent evidence of discrimination came from Ashkar's testimony that Lieutenant Colonel Timmons used a racial slur against him, but Ashkar failed to adduce evidence

24

establishing that Lieutenant Colonel Timmons' "improper attitude infected the decision by Chief Morris and Mayor Archer to remain with Alley Cat in February of 2015." According to the Town, Lieutenant Colonel Timmons' role "was merely to investigate solutions to an immediate problem and to make a recommendation to Chief Morris about how to proceed." Even accepting allegations of Lieutenant Colonel Timmons' racial animus against Ashkar as true, the Town argues that there is no evidence to connect the animus to Chief Morris and Mayor Archer without speculation, conjecture or hypothesis. Therefore, the circuit court's grant of the motion for JNOV must be affirmed.

Assuming *arguendo*, that we reverse the motion for JNOV, the Town argues that the Court of Special Appeals erred in reinstating the jury's damage award. The Town requests that the circuit court, upon remand, enter a judgment for zero dollars, or for the circuit court to rule on the Town's post-trial motion for a new trial and motion for remittitur. According to the Town, the Court of Special Appeals ignored the analysis and ruling of the circuit court that Ashkar failed to prove damages in any non-speculative manner. Reinstating the jury verdict, according to the Town, would conflict with the judgment of the circuit court. The Town also contends that the circuit court did not make a "gratuitous" ruling regarding damages, rather an implicit striking of Ashkar's expert testimony and "a ruling on relief in the alternative in the form of remittitur."

If this Court does not uphold the circuit court's striking of the damage award, then the Town asserts that it retains the right to have its motion for remittitur resolved on the merits. In the Town's view, the circuit court was "forecasting that remittitur in the alternative would have applied had [it] not granted the [motion for JNOV]." The remand

25

order from the Court of Special Appeals conflicts with the circuit court's "ruling" on damages and deprives the Town an opportunity to present its alternative argument on the merits. The Town asserts that it could not have appealed any aspect of the issue of damages because the circuit court granted its motion for JNOV.

At a minimum, the Town contends that the limitation on liability or "cap" provided in the LGTCA applies to Ashkar's discrimination claim, which should reduce the total judgment to $200,000. According to the Town, it had no occasion to raise the LGTCA argument unless and until the jury awarded damages in excess of the cap. The Town contends that the circuit court agreed with its position during the hearing on the motion for JNOV when the Town first argued that the LGTCA cap applied. If this Court gives credence to Ashkar's argument that the circuit court stated there will be no new trial, according to the Town, it must also give credence to the circuit court's statement that the LGTCA applies.

Finally, the Town argues that the jury's award was deficient as a matter of law because it arose from Ashkar's claim of discrimination based on Prince George's Cty. Code § 2-229, which does not provide a cognizable basis for relief.

In response, Ashkar asks this Court to affirm the Court of Special Appeals and hold that there was sufficient evidence for a jury to find that the Town intentionally discriminated in its employment decision. Ashkar asserts that the Town's request for a more stringent *prima facie* case for employer discrimination should be rejected because it was waived and unpreserved. According to Ashkar, this Court has repeatedly held that the burden-shifting framework, under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93

26

S. Ct. 1817 (1973), applies to employment discrimination cases. The Town requested and received jury instructions that described this burden-shifting framework, including an explanation of the business judgment rule. The Town never objected to the instruction and did not raise the issue on cross-appeal.

On the merits, Ashkar argues that the Court of Special Appeals correctly determined that the evidence of discrimination rose above speculation, hypothesis, and conjecture, and therefore the jury verdict should be reinstated. Ashkar presented sufficient evidence of discriminatory animus. Ashkar overheard Lieutenant Colonel Timmons use a racial slur against him. Lieutenant Turner told Ashkar that he was never going to get the contract. When Sergeant Sease contacted Sergeant Sommerville at the RPPD, he was told by Sergeant Sommerville that Ashkar was a foreigner and cannot pass a background check.

According to Ashkar, this discrimination by the RPPD can be imputed to the Town. Mayor Archer testified that he directed Ashkar's inquiry about the towing contract "to the police department" because they were the people who make that decision, not the mayor. Chief Morris directed Lieutenant Colonel Timmons to "handle" the towing situation. Even if Lieutenant Colonel Timmons did not have final decision-making authority for the towing contract, it was reasonable for the jury to infer that Lieutenant Colonel Timmons influenced the decision.

According to Ashkar, the Town's nondiscriminatory business reason for using the Tow List was pretextual. Ashkar cites *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147–48, 120 S. Ct. 2097, 2108 (2000), for the proposition that pretext may be shown by providing evidence that the employer's explanation is false, unworthy of credence, and

discrimination was the true reason for the adverse employment action. Ashkar notes that while the Town has always used a company on the Tow List, there has never been a written or formal policy until the present litigation. The only reason why the Town had always used a company on the Tow List is because it exclusively used Greg's for over thirty years.

Ashkar also argues that the Court of Special Appeals did not err in reinstating the jury verdict without considering the Town's alternative motion for a new trial or remittitur (which also requires a new trial). According to Ashkar, the circuit court could not have implicitly authorized or alternatively granted a new trial when it unequivocally stated there would not be a new trial during the hearing. Even if the circuit court impliedly or alternatively granted the motion, the Court of Special Appeals correctly relied on Md. Rule 2-532 when it concluded these arguments were not properly preserved for appellate review.

Ashkar argues that the liability cap provided in the LGTCA is not applicable to the award of damages and consideration of the issue is procedurally barred because the Town did not properly present the argument before this Court or in a cross-petition. Finally, Ashkar contends that the Town waived its argument regarding Prince George's Cty. Code § 229 as an improper statutory basis to bring an employment discrimination claim, when the Town failed to object to the jury instructions predicated on the statute.

**Analysis of Motion for JNOV**

**A. The Court of Special Appeals correctly reversed the grant of the motion for JNOV because Ashkar presented sufficient evidence for a jury to conclude that the Town discriminated on the basis of national origin in its employment decision.**

State Gov't § 20-1202(b) provides "a person that is subjected to a discriminatory act prohibited by the county code [of Prince George's County] may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief." *See also Haas v. Lockheed Martin Corp.*, 396 Md. 469, 495, 914 A.2d 735, 750–51 (2007) (noting that remedial statutes, like State Gov't § 20-1202, "should be construed liberally in favor of claimants seeking its protection").

Ashkar based the employment discrimination claim, authorized by State Gov't § 20-1202, under Prince George's Cty. Code § 2-229(a) that provides:

(a) The Human Relations Commission shall have the authority to investigate, and hold formal hearing, on any sworn complaint against any law enforcement officer operating within the County, except a complaint against a member of the Prince George's County Police Department, which alleges any of the following categories of complaints *that are defined and prohibited by law or regulation*:

(1) Police harassment;

(2) The excessive use of force in the performance of his duties;

(3) *The use of language which would demean the inherent dignity of any person.*

(Emphasis added.)

As a threshold matter, the Town's argument that Ashkar used an improper right of action to bring the discrimination claim is not before this Court, because it was not

29

advanced in the motion for judgment. *Sage Title Grp., LLC v. Roman*, 455 Md. 188, 216, 166 A.3d 1026, 1042 (2017). The argument was also waived by the Town when it did not object to the instructions provided to the jury before deliberations. Md. Rule 2-520(e) ("No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."); *Barone v. Winebrenner*, 189 Md. 142, 145–46, 55 A.2d 505, 506 (1947) ("The purpose, of course, in requiring exceptions to be made to the instructions of the trial judge before the jury retires is to give that judge an opportunity to correct or add to his [or her] instructions matters either first erroneously stated or omitted. The *court's charge to the jury should properly state the law of the case. . . .* In the instant case, [since] no objection was made to the instructions before the jury retired to consider its verdict, and, [] no specific grounds of objection were stated before the jury retired . . . we are prevented on appeal from considering errors in the instructions given in the case. . . . [I]t might be well to say that in our opinion the instructions fairly covered the law of the case.") (emphasis added).

The Town acknowledged, in its motion for judgment, that Maryland courts have used the analogous federal analytical framework under Title VII of the Civil Rights Act of 1964 to evaluate claims of discrimination. 42 U.S.C. § 2000e-2(a)(1).[21] The circuit court used and explained the burden-shifting framework in the jury instruction.[22] This Court has

---

[21] *See supra* note 20.

[22] The jury instruction provided:

(continued . . .)

30

recognized that Title VII is the federal analog to State Gov't § 20-1202 and has expressly been guided by cases from the United States Supreme Court in resolving discrimination claims arising under Maryland law. *Haas*, 396 Md. at 481 n.8, 914 A.2d at 743 n.8. We again do so here.

***Ashkar presented sufficient evidence of employment discrimination to withstand a motion for JNOV.***

To overcome a motion for JNOV on appeal, the plaintiff must demonstrate that a reasonable jury could find, by a preponderance of evidence, that the employer intentionally discriminated in its employment decision. The defendant must establish that *no* reasonable jury could find the standard was met. A plaintiff may establish employment discrimination through direct evidence or circumstantial evidence. *Taylor v. Giant of Md.*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011) (citing federal cases as guidance in allowing plaintiffs to prove discrimination with circumstantial evidence); *Molesworth v. Brandon*, 341 Md. 621, 638, 672 A.2d 608, 617 (1996) (noting that without the benefit of direct evidence, the employee must first make out a *prima facie* case of discrimination).

---

(. . . continued)

> In order to recover, [] Ashkar must show the Town [], through its employees and or agents, intentionally discriminated against him. [] Ashkar may produce direct evidence of intentional discrimination or intentional discrimination may be inferred from the existence of circumstantial evidence. When the Town [], through its employees and or agents, show a legitimate nondiscriminatory reason for its action, [] Ashkar, in turn, may rebut that showing by proving that the stated reason was not the true reason but was only a pretext or excuse for [the] Town [] through its employees and or agents discriminating against [] Ashkar because of his national origin. If you find that the Town [], through its employees and or agents, stated reason for its action was not the true reason, you may, but are not required to, infer that national origin was motivating factor for the decision.

If a plaintiff, as Ashkar does here, seeks to establish employment discrimination through circumstantial evidence, the order and allocation of proof follows a burden-shifting framework, originally outlined by the United States Supreme Court in *McDonnell Douglas*. *Molesworth*, 341 Md. at 638, 672 A.2d at 616. "[T]he employee must first make out a [*prima facie*] case of discrimination." *Id.*, 672 A.2d at 617. To establish a *prima facie* case of discrimination—step one in the three-step *McDonnell Douglas* burden-shifting framework—the plaintiff must show:

> (i) that he [or she] belongs to a racial minority; (ii) that he [or she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his [or her] qualifications, he [or she] was rejected; and (iv) that, after his [or her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824 (footnoted omitted). What circumstantial evidence is required depends on the circumstances of the case. *Molesworth*, 341 Md. at 638, 672 A.2d at 617. The burden of production for a *prima facie* case of discrimination is minimal. *Burdine*, 450 U.S. at 253–54, 101 S. Ct. at 1093.

At step two, after the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment decision taken against the plaintiff. *Id.*, 101 S. Ct. at 1093; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 2748 (1993) ("By producing *evidence* (whether ultimately persuasive or not) of nondiscriminatory reasons, [the defendants] sustained their burden of production[]"); *see also Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109 ("an employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was

32

untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred").

"If the defendant carries this burden of production, the presumption raised by the [*prima facie*] case is rebutted[.]" *Burdine*, 450 U.S. at 255, 1010 S. Ct. at 1094–95. At step three, the burden of persuasion ultimately shifts back to the plaintiff, who must have an opportunity "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Molesworth*, 341 Md. at 638–39, 672 A.2d at 617 (quoting *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093). In *Burdine*, the United States Supreme Court explained that the plaintiff may satisfy the burden of persuasion either through a direct showing that the discriminatory reason more likely motivated the adverse employment decision than not or through an indirect showing that the employer's proffered explanation is unworthy of credence. *Id.* at 256, 101 S. Ct. at 1095.

Applying the *McDonnell Douglas* burden-shifting framework to the case at bar, and as we shall explain below, we conclude that Ashkar presented sufficient evidence of discrimination to withstand a motion for JNOV. At step one, Ashkar established a *prima facie* case of discrimination. The Town contends that because Ashkar, in its estimation, was not *as qualified* as AlleyCat, he cannot establish a *prima facie* case for discrimination. We are not persuaded by the Town's argument, nor shall we read a more stringent burden of production into the first step of the *McDonnell Douglas* burden-shifting framework.[23]

---

[23] The Court of Special Appeals recognized the applicability of the *McDonnell*

(continued . . .)

33

All that Ashkar must show to establish a *prima facie* case of discrimination is that as a member of a protected class, he was qualified, but despite those qualifications, his application for the tow contract was rejected, and given to somebody else.

In this case, Ashkar, as a first-generation Palestinian-American, is a member of a protected class. *Wheeler v. State*, 281 Md. 593, 601, 380 A.2d 1052, 1057 (1977) (acknowledging national origin as a protected class). Ashkar demonstrated his qualifications for the towing contract. He personally had considerable towing experience, as a co-owner of Five Star Towing, before purchasing Greg's, which had operated as the exclusive towing company in the Town for over three decades. His ownership of Greg's continued to provide the Town with a towing provider and secured vehicle storage facility within municipal boundaries. At all times, before and after Ashkar's purchase of the business, Greg's maintained the required licensure and permits pursuant to municipal, county, and state law for over thirty years.

Discussed in more depth below, Greg's lapsed membership on the Tow List does not negate Ashkar's qualifications for employment. There was no evidence that the Tow

---

(. . . continued)

*Douglas* burden-shifting framework in a discrimination case thirty-seven years ago in *State Comm'n on Human Relations v. Wash. Cty. Cmty. Action Council, Inc.*, 59 Md. App. 451, 455–56, 476 A.2d 222, 224 (1984) ("The basic allocation of burdens and order of presentation of proof in cases of racial discrimination has been delineated by the Supreme Court of the United States in *McDonnell Douglas*[.]"). This Court also first cited the *McDonnell Douglas* burden-shifting framework in *Stanley v. State*, 313 Md. 50, 542 A.2d 1267 (1988) and examined the framework in detail in *Molesworth*. 341 Md. at 638, 672 A.2d at 617. In *Molesworth*, this Court cited *Burdine* but never implied that *Burdine* affected the *McDonnell Douglas* burden-shifting framework in any way. *Id.* at 638–39, 672 A.2d at 617.

List, as the Town contends, was a "necessary certification" for employment. The Tow List requirement was not provided in the Town Charter, in the Town Code, in any Town ordinance, or in any Town resolution. The record does not indicate that the Tow List was an official employment policy of the Town or the RPPD. We see no evidence that the Tow List had ever been used as a requirement for employment, even as an unofficial guideline, before the present litigation. Neither Ashkar, nor AlleyCat mentioned the Tow List in their bids for the Town's towing contract. Finally, we note that not even Prince George's County required membership on the Tow List for its towing service providers until *after* the present litigation.

At most, the Tow List could have provided a nondiscriminatory and legitimate business reason for the Town to award the towing contract to AlleyCat over Ashkar. Even if this is true, in these circumstances, it must be separately analyzed in the second and third steps of the *McDonnell Douglas* framework. Ashkar was not required, as the Town contends, to show that Greg's was *more* qualified than AlleyCat to establish a *prima facie* case of discrimination. "*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that *similarly situated employees were not treated equally*." *Burdine*, 450 U.S. at 258, 101 S. Ct. at 1096 (emphasis added).

Assuming *arguendo*, that Ashkar was required to demonstrate superior credentials, apart from AlleyCat's status as the interim provider of towing services, Greg's appeared *more* qualified than AlleyCat. Chief Morris testified, when providing his recommendation to Mayor Archer, that there were three main criteria for selecting AlleyCat: (1) the Town had been receiving "high quality of service" from AlleyCat during the interim, (2) AlleyCat

35

had been in business for many years, and most importantly, (3) it was on the Tow List, and thereby had been vetted by Prince George's County. Greg's application surpassed AlleyCat's in all three facets.

Greg's was established in 1974 in Riverdale and served the community for over thirty years. AlleyCat was founded in 2000 and is located in Hyattsville, Maryland. Greg's location in the center of town enabled more convenient towing and car storage services for the citizens of the Town and the RPPD, not to mention it would have furthered the Town's policy for promoting local businesses. Greg's had cultivated business relationships and a good reputation with multiple insurance companies, Prince George's County, Maryland State Police, the United States Postal Inspection Service, the United States Office of the Inspector General, and the City of College Park, among others. Greg's had also been on the Tow List for years and thus, by the Town's purported business rationale, had been vetted by the Prince George's County Police Department multiple times. When Prendable applied mid-cycle to rejoin the Tow List, Lieutenant Macherko testified that Greg's would have qualified but for the missed application deadline.

Despite awareness of Ashkar's qualifications for employment, the Town rejected his application for employment, and continued to keep the contract open until it awarded its business to AlleyCat in February 2015. These facts, examined in the light most favorable to Ashkar, satisfy a *prima facie* case of discrimination "because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors." *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949 (1978)).

36

Since Ashkar established a *prima facie* case of discrimination, the burden shifts to the Town "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Id.*, 101 S. Ct. at 1094. "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* at 255, 101 S. Ct. at 1094 (footnote omitted). This requirement is a low bar because the Town "need not persuade the court that it was *actually motivated by the proffered reasons*[]" because the burden of showing pretext ultimately falls on Ashkar. *Id.* at 254, 101 S. Ct. at 1094 (emphasis added).

The Town satisfied its burden of production by pointing to the Tow List as a legitimate business reason for selecting AlleyCat over Ashkar. According to the Town, the Tow List provided a useful and expedient sorting and evaluation tool when deciding between prospective bids that also conserved the Town's limited personnel resources. According to the Town, AlleyCat's inclusion on the Tow List and Greg's omission during the 2014–15 Tow List cycle provided the decisive factor in awarding the towing contract to AlleyCat. While the record does not support the Town's contention that Greg's omission from the Tow List rendered Ashkar unqualified for employment, the Tow List does provide a legally sufficient and nondiscriminatory reason for why AlleyCat may have been preferred.

The alleged legitimate business reason produced by the Town means that Ashkar, at step three, retained the ultimate burden of persuading the jury that he had been the victim of employment discrimination. *Id.* at 256, 101 S. Ct. 1095. Ashkar may prevail by showing

37

directly that a discriminatory reason, more likely than not, motivated the adverse employment decision or indirectly by showing that the Town's Tow List explanation is unworthy of credence. *See McDonnell Douglas*, 411 U.S. at 804–05, 93 S. Ct. at 1825–26. Ashkar presented sufficient evidence so that reasonable jurors, applying the preponderance of evidence standard of proof in a light most favorable to Ashkar, could find either that a discriminatory reason motivated the Town's selection of AlleyCat or that the Tow List explanation is unworthy of credence. *Bradford v. Jai Med. Sys. Managed Care Orgs., Inc.,* 439 Md. 2, 15, 93 A.3d 697, 705 (2014) (when reviewing a motion for JNOV, "[w]hether a particular theory of liability may apply and the appropriate standard of proof under that theory are necessarily legal questions on which the reviewing court is not required to accord any deference to the [circuit] court.").

Ashkar presented sufficient evidence that discrimination against his national origin motivated the Town's employment decision. Ashkar testified that Lieutenant Colonel Timmons called Ashkar a "camel jockey" on two separate occasions. The slur used by Lieutenant Colonel Timmons may have been sufficient, by itself, to infer discrimination,[24] but the record provides at least two more indications of discriminatory animus by the RPPD, directed against Ashkar based on his national origin. When Sergeant Sease of the

---

[24] In *Amirmorki v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1134 (4th Cir. 1995), cited by the Maryland Bar Association Employment Law Deskbook as an example of impermissible incidents of discrimination under Title VII, the Fourth Circuit found that racial slurs like "camel jockey," among others, would be sufficient to reverse summary judgment on a Title VII claim of national origin harassment and constructive discharge. The Maryland State Bar Association, Inc., Maryland Employment Law Deskbook, chpt. 28 (2016).

local FOP called his contact within the RPPD to discuss Greg's, he was told, "no, no, no, don't use this company, Mike [is] not his real name, these guys can't pass a background check and pretty much he's a foreigner and just stick with -- we've got to stick together." A less overt indication of discrimination, but no less relevant for the consideration of the jury, came from Lieutenant Turner, who following Lieutenant Colonel Timmons' statement, "this fucking camel jockey doesn't get the point[,]" brought Ashkar into an interview room at the police station, loomed over him, and admonished Ashkar that he would "never" get the contract and to "stop bothering us and don't come back here."

These instances of discrimination from RPPD officers are reasonably imputed to the Town. While the Town argues that the mayor has ultimate decision making authority, not the RPPD, Mayor Archer testified that he relied on the recommendation of Chief Morris for the selection of AlleyCat, and that he directed Ashkar "to the police department" because they were the people who make that decision, not the mayor. Chief Morris then delegated his responsibility for the towing contract decision to Lieutenant Colonel Timmons and Lieutenant Turner, and Chief Morris followed their recommendation:

> [Chief Morris]: Lieutenant Colonel Timmons and Lieutenant Turner met with AlleyCat after confirming that Mr. Prendable was not going to be towing. They reported back to me the results of that meeting . . . and *I concurred with the recommendation to move forward and directed Lieutenant [Colonel] Timmons to do so*.

(Emphasis added). This delegation of decision-making authority from Chief Morris to Lieutenant Colonel and Assistant Chief Timmons was authorized by Town of Riverdale Park, Md., Code § 53-10(a). *See also* Town of Riverdale Park, Md., Code § 64-15 (providing the RPPD with the authority to remove and impound unattended vehicles).

39

Testimony from the Town's own witnesses indicate that the RPPD, and specifically Lieutenant Colonel Timmons, was the most important voice in denying Ashkar's bid for employment.

In fact, the only evidence of a written towing agreement came from Lieutenant Colonel Timmons himself, who wrote a letter, on behalf of the RPPD, that awarded the towing contract to AlleyCat on a provisional basis. This letter stated that "*we*," as the RPPD, "desire AlleyCat [] begin towing for *us*." There was enough evidence for the jury to reasonably infer that Lieutenant Colonel Timmons' racial animus towards Ashkar influenced, if not determined, Chief Morris' recommendation for the towing contract, and by extension, the Town's adverse employment decision against Ashkar. This evidence was sufficient to raise the claim of employment discrimination above speculation, hypothesis, and conjecture.

Alternatively, Ashkar presented sufficient evidence for the jury to find that the Town's use of the Tow List as a nondiscriminatory reason for the adverse employment decision was not worthy of credence. The record is bereft of any written policy, ordinance, or resolution that listed the Tow List as a factor, let alone a decisive factor, in selecting a towing company. Chief Morris testified that he was not aware of a written Tow List policy. Mayor Archer contradicted Chief Morris and testified that there was a written policy, but the Town did not produce any evidence of a written policy to verify Mayor Archer's contention. The contradictory statements from the two principal decision makers regarding the towing contract undermines the credence of the Town's proffered non-discriminatory rationale for its adverse employment decision.

40

The contradictory testimony also presents a quintessential question of fact best left to the jury to resolve. *Estate of Blair v. Austin*, 469 Md. 1, 18, 228 A.3d 1094, 1103 (2020) ("We have long held that '[n]either the [circuit] court nor this Court is permitted to substitute its evaluation of [the] evidence for that of the jury. . . . To do so would be an invasion of the jury's province[]'"); *Devincentz v. State*, 460 Md. 518, 561, 191 A.3d 373, 398 (2018) ("Assessing a witness's credibility and deciding the weight to be assigned to that witness's testimony are tasks solely delegated to the jury."). If the Tow List provided the decisive touchstone for evaluating bids, then the jury could have reasonably questioned why Chief Morris, Lieutenant Colonel Timmons, Lieutenant Turner, Mayor Archer, or any of the Town administrators never mentioned the Tow List as a necessary qualification during the eight month period in which Ashkar earnestly pursued the towing contract.

The resolution that formalized the Town's preference in giving business to local vendors, passed eight months before the towing contract decision was made, further renders the Tow List rationale as not credible. Greg's, as the only local towing service within the Town's municipal limits, should have been favored according to the resolution. With this resolution in mind, and as a practical matter, the jury could have also reasonably questioned why the Town would have outsourced the vetting process to the Prince George's County Police Department when the Town took the time to solicit and review extensive applications from both AlleyCat and Ashkar consisting of personal, towing and tax records, and even client testimonials.

Finally, our review of the record, including an examination of the Town's Code, ordinances, and resolutions, produced no official criteria, let alone written policy, for

41

selecting a towing vendor. We also found no evidence of the Town incorporating Prince

George's County towing ordinances or policies by reference. The absence of official Town

ordinances, resolutions, or written policies contrasts with the Town's extensive paper-trail

of resolutions and ordinances that chronicle and direct the Town's business decisions with

local vendors in precise and granular detail.[25]

A jury could have reasonably decided that the Tow List was a post-hoc rationale for

selecting AlleyCat and was not worthy of credence. *International Bhd. of Teamsters v.*

*United States*, 431 U.S. 324, 341–42, 97 S. Ct. 1843, 1858 (1977) ("The company's later

changes in its hiring [] policies could be of little comfort to the victims of the earlier []

discrimination, and could not erase its previous illegal conduct or its obligation to afford

relief to those who suffered because of it."). We hold that Ashkar provided sufficient

evidence for a jury to find that the Town's rejection of Greg's based on the Tow List was

either directly motivated by discrimination or indirectly used as a pretext.

**B. The Court of Special Appeals correctly instructed on remand to reinstate the verdict, which does not preclude the circuit court from making necessary rulings in accordance with this opinion without the need for a new trial.**

Maryland Rule 8-604(d)(1) generally governs circuit court proceedings following

remand:

> If the Court concludes that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower court shall conduct any further proceedings necessary to

---

[25] *See supra* note 5.

determine the action in accordance with the opinion and order of the appellate court.

(Emphasis added.)

The specific scope of our remand when reversing a motion for JNOV is controlled by Md. Rule 2-532(f)(1):

> If a motion for judgment notwithstanding the verdict is granted and the appellate court reverses, *it may (A) enter judgment on the original verdict,* (B) remand the case for a new trial in accordance with a conditional order of the [circuit] court, or (C) itself order a new trial. If the [circuit] court has conditionally denied a motion for new trial, the appellee may assert error in that denial and, if the judgment notwithstanding the verdict is reversed, subsequent proceedings shall be in accordance with the order of the appellate court.

(Emphasis added.)

The Court of Special Appeals reversed the motion for JNOV and remanded with the direction to enter judgment on the original verdict pursuant to Md. Rule 2-532(f)(1)(A). The Court of Special Appeals declined to address the Town's alternative arguments concerning insufficient evidence of damages, excessive damages, or limitation of damages pursuant to the LGTCA because none of these arguments were originally raised in the Town's initial motion for judgment. The Court of Special Appeals noted that an argument not raised in the initial motion for judgment is waived in the motion for JNOV. *Ashkar*, 2020 WL 4371289 at *3 n.4 (citing Md. Rule 2-532(a); *Sage Title Grp., LLC*, 455 Md. at 216, 166 A.3d at 1042 (holding that a party cannot raise an argument in a motion for JNOV when it fails to raise the argument in the original motion for judgment)).

The Court of Special Appeals correctly acknowledged that an argument not raised in the motion for judgment is waived in the motion for JNOV. *Id.* The Court of Special

43

Appeals also correctly characterized the circuit court's brief discussion of excessive damages as "gratuitous" in terms of the motion for JNOV, because it was not necessary to the determination of whether there was sufficient evidence to present the claim of discrimination to the jury. *Id.*; *see also Plank v. Cherneski*, 469 Md. 548, 594, 231 A.3d 436, 463 (2020) (defining a "judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case" as dicta). While the Town's post-judgment arguments may have been correctly precluded from consideration in the motion for JNOV, we cannot say from the record, whether the circuit court made two rulings—required by Maryland law—relating to the Town's alternative motion for a new trial and to the application of the LGTCA.

Maryland Rule 2-533(c) requires a circuit court to decide whether to alternatively grant a motion for a new trial if the motion for JNOV is thereafter reversed on appeal:

> When a motion for new trial is joined with a motion for judgment notwithstanding the verdict and the motion for judgment notwithstanding the verdict is granted, *the court at the same time shall decide whether to grant that party's motion for new trial if the judgment is thereafter reversed on appeal*.

(Emphasis added.)

In *Baliles v. Bryant*, the defendant, pursuant to the predecessor to Md. Rule 2-533,[26] joined a motion for a new trial with its motion for JNOV. 207 Md. 332, 338, 114 A.2d

---

[26] The predecessor to Md. Rule 2-533 provided:

A motion for a new trial may be joined with a motion for judgment under this rule or a new trial may be prayed for in the alternative. Failure to move for judgment under this rule does not affect a party's right upon appeal to

(continued . . .)

601, 603 (1955).  The motion for a new trial "raised two points in addition to the question presented by the motion for [JNOV]." *Id.*, 114 A.2d at 603.  The circuit court granted the motion for JNOV, but did not rule upon the motion for a new trial.  *Id.*, 114 A.2d at 603.  On appeal, this Court reversed the grant of the motion for JNOV and remanded "the case for consideration by the [circuit court] of these two points raised by the motion for a new trial." *Id.*, 114 A.2d at 604; *see also Kremer v. Fleetway Cab Co.*, 197 Md. 557, 564, 79 A.2d 853, 856 (1951) ("As the trial judge in this case did not rule upon appellee's motion for a new trial, [following the grant of the motion JNOV,] we must remand the case for a ruling by the trial judge on that motion[]"); *c.f. Fennel v. G.A.C. Fin. Corp. of Balt. No. 3*, 242 Md. 209, 229–30, 218 A.2d 492, 503 (1966) ("Since we have dealt with *all of the matters* which might be argued in support of the motion we see no reason for ordering a new trial nor do we see any reason why it should be sent back for a ruling[.]") (emphasis added).

The Town, similar to the defendant in *Baliles*, and as permitted under Md. Rule 2-532(c), submitted a motion for JNOV simultaneously with a motion for a new trial.  Despite this concurrent submission, the record presents two contrasting intentions of the circuit court as to whether to grant a new trial.  During the hearing on the motion for JNOV, the circuit court stated "I can just tell you all now there will be no new trial.  There is not going

(. . . continued)
    assign as error the denial of his motion for a directed verdict.

General Rules of Practice and Procedure, 6 Md. L. Rev. 91, 111 (1941) (quoting Rule 8(a) of Part Three, Subdivision III of the General Rules of practice and procedure).

45

to be a new trial[.]"[27]  On the other hand, in its memorandum and order, the circuit court appeared to forecast its intention, without stating expressly, that it would have ordered a new trial but for the grant of the motion for JNOV.

Even though the circuit court granted the motion for JNOV, it was required pursuant to Md. Rule 2-533(c) "at the same time shall decide" whether to grant a motion for a new trial if the judgment was later reversed on appeal.  Md. Rule 1-201(a) ("When a rule, by the word 'shall' or otherwise, mandates or prohibits conduct, the consequences of noncompliance are those prescribed by these rules or by statute."); *see Gen. Motors Corp. v. Seay*, 388 Md. 341, 356, 879 A.2d 1049, 1057 (2005) ("As we have said time and time again, the Maryland rules are 'precise rubrics,' which are to be strictly followed.") (citation omitted); *see also Banegura*, 312 Md. at 625, 541 A.2d at 977 ("the first opportunity to object [to an excessive verdict] is through the motion for a new trial.  We hold that Banegura had not waived his right to request a remittitur").

The second outstanding legal issue for consideration on remand concerns the application of the liability limitation or damages "cap" of the LGTCA.  In *Bowden v. Caldor, Inc.*, this Court noted that "when the law imposes a limitation or cap upon damages, Article 23 of the Declaration of Rights does not preclude a court from reducing the jury's award of damages to such limitation or cap."  350 Md. 4, 46–47, 710 A.2d 267, 287–88

---

[27] This Court does not review the refusal to grant a new trial unless the circuit court abused its discretion.  *Conklin v. Schillinger*, 255 Md. 50, 66, 257 A.2d 187, 195 (1969).  Similarly, the grant or refusal of a remittitur, which orders a new trial unless the plaintiff accepts a lesser sum fixed by the court is also within the discretion of the circuit court.  *Banegura v. Taylor*, 312 Md. 609, 624, 541 A.2d 969, 976 (1988).  We do not suggest that the circuit court would have abused its discretion in denying the motion for a new trial.

(1998) (citing *Murphy v. Edmonds*, 325 Md. 342, 370–75, 601 A.2d 102, 116–18 (1992)). The application of the liability limitation pursuant to the LGTCA presents a question of law to be decided by the circuit court upon remand. "[I]t is proper to place the responsibility for resolving such a conflict 'with the [circuit] court, a tribunal which is in a position vastly superior to that of an appellate court to perform this very important task.'" *Simpkins v. Ford Motor Credit Co.*, 389 Md. 426, 440, 886 A.2d 126, 134–35 (2005) (quoting *Kowell Ford, Inc. v. Doolan*, 283 Md, 579, 584, 391 A.2d 840, 843 (1978)). The verdict may be reinstated without the need of a new trial if there are only outstanding issues of law that must be addressed on remand. *Bowden*, 350 Md. at 47, 710 A.2d at 288.

The LGTCA limits the liability of local government, including municipalities like the Town. At the time of the Town's discrimination against Ashkar, the statute limited liability to $200,000 for a single claim. Cts. & Jud. Proc. § 5-303(a)(1) (1974, 2006 Repl. Vol.). In this case, the jury awarded $244,212 in damages and $15,000 in non-economic damages. The issue of whether the liability limitation pursuant to Cts. & Jud. Proc. § 5-303(a)(1) (1974, 2006 Repl. Vol.) applies in this case is to be considered on remand.

### CONCLUSION

For the reasons previously explained, we affirm the judgment of the Court of Special Appeals.

47

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY PETITIONER.**